# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| DR. SEUSS ENTERPRISES, L.P., a California limited partnership, <br><br>          Plaintiff - Appellant, <br><br> v. <br><br> COMICMIX LLC, a Connecticut limited liability company; GLENN HAUMAN, an individual; DAVID JERROLD FRIEDMAN, an individual, AKA David Gerrold; TY TEMPLETON, an individual, <br><br>          Defendants - Appellees. | No. 19-55348 <br><br> Appeal from District Court <br> Case No. 3:16-cv-02779-JLS-BGS <br><br> United States District Court for the Southern District of California <br> Hon. Janis L. Sammartino <br><br> **OPENING BRIEF OF PLAINTIFF-APPELLANT DR. SEUSS ENTERPRISES, L.P.** <br><br> **REDACTED** |

ANDREW L. DEUTSCH
DLA PIPER LLP (US)
2000 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-4704
Telephone: (310) 595-3000
Facsimile: (310) 595-3300

TAMAR Y. DUVDEVANI
MARC E. MILLER
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone: (212) 335-4799
Facsimile: (212) 335-4501

STANLEY J. PANIKOWSKI
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone: (619) 699-2643
Facsimile: (619) 699-2701

*Attorneys for Plaintiff-Appellant*
Dr. Seuss Enterprises, L.P.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiff-Appellant

Dr. Seuss Enterprises, L.P. states that it has no parent company and no publicly-

held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

I.    JURISDICTIONAL STATEMENT ...................................................1

II.   STATEMENT OF ISSUES PRESENTED FOR REVIEW ...........................1

III.  RELEVANT STATUTORY PROVISIONS..........................................1

IV.  STATEMENT OF THE CASE ......................................................2

    A.     Plaintiff DSE .................................................................2

    B.     Defendants and the Genesis of *Boldly* ................................4

    C.     Defendants' Plans to Publish and Sell *Boldly* ......................7

    D.     DSE's Demand Letters and Defendants' Reaction .................9

    E.     *Go!* Illustrations Used in *Boldly* ..................................10

    F.     DSE Trademarks Used in *Boldly* ...................................13

    G.     Procedural History.......................................................15

V.    SUMMARY OF ARGUMENT ....................................................19

VI.  ARGUMENT............................................................................22

    A.     Standard of Review .......................................................22

    B.     *Boldly* Is an Infringement of DSE's Copyrights, Not a Fair Use........22

        1.    The Four Statutory Fair Use Factors.........................24

        2.    The District Court Ignored the Most Relevant Precedent: This Court's Decision in *DSE v. Penguin Books*.....................25

        3.    *Boldly* Does Not Present a "Preamble Use" .............................27

        4.    The "Purpose and Character" Of *Boldly's* Use of *Go!* Is Not Transformative and Weighs Against Fair Use (First Factor) ...28

        5.    The Nature of Dr. Seuss's Works Weighs Against Fair Use (Second Factor) ..........................................................41

        6.    The Amount and Value of Material Taken by Defendants from Dr. Seuss Was Excessive and Weighs Against Fair Use (Third Factor)....................................................41

        7.    The Harm to DSE's Potential Markets Weighs Against Fair Use (Fourth Factor)................................................48

        8.    The Factors Weighed Together Show That *Boldly* Is Not a Fair Use .................................................................56

i

# TABLE OF CONTENTS
## (Cont.)

**C.** The District Court Also Erred in Dismissing DSE's Trademark Claims as a Matter of Law ...................................................................57

    **1.** The First Amendment Does Not Automatically Protect Defendants' Infringing Book Title. .........................................57

    **2.** Dr. Seuss's Distinctive Illustration Style and Font Are Eligible for Trademark Protection. ...........................................61

**VII.** CONCLUSION.................................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) ...............................................................35

*adidas Am., Inc. v. Skechers USA, Inc.*,
  890 F.3d 747 (9th Cir. 2018) ...............................................................63

*Adray v. Adry-Mart, Inc.*,
  76 F.3d 984 (9th Cir. 1995) .................................................................63

*Bach v. Forever Living Prods. U.S., Inc.*,
  473 F. Supp. 2d 1110 (W.D. Wash. 2007) ..........................................62

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ................................................................35

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) ................................................................38

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)......................................................................passim

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) ................................................................38

*Castle Rock Entm't v. Carol Pub. Grp., Inc.*,
  150 F.3d 132 (2d Cir. 1998) .........................................................36, 56

*Disney Enters. v. VidAngel, Inc.*,
  224 F. Supp. 3d 957 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir.
  2017) ...........................................................................................36, 49

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,
  109 F.3d 1394 (9th Cir. 1997) .....................................................passim

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

*Elvis Presley Enters., Inc. v. Passport Video*,
349 F.3d 622 (9th Cir. 2003), *overruled on other grounds*, *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989 (9th Cir. 2011) ...................................................................36, 42, 51

*Equals Three, LLC v. Jukin Media Inc.*,
139 F. Supp. 3d 1094 (C.D. Cal. 2015) ...............................................53

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*,
198 F.3d 1143 (9th Cir. 1999) .............................................................62

*Gordon v. Drape Creative, Inc.*,
909 F.3d 257 (9th Cir. 2018) ........................................................passim

*Harlequin Enters. Ltd. v. Gulf & Western Corp.*,
644 F.2d 946 (2d Cir. 1981) ................................................................62

*Harper & Row v. Nation Enter.*,
471 U.S. 539 (1985)..............................................................22, 28, 48

*Harris v. Cty. of Orange*,
682 F.3d 1126 (9th Cir. 2012) ............................................................22

*Hofheinz v. A & E Television Networks*,
146 F. Supp. 2d 442 (S.D.N.Y. 2001) .................................................35

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ..............................................................46

*L.A. News Serv. v. Reuters Television Int'l*,
149 F.3d 987 (9th Cir. 1998) ..............................................................28

*Leadsinger, Inc. v. BMG Music Pub.*,
512 F.3d 522 (9th Cir. 2008) ..............................................................38

*Leibovitz v. Paramount Pictures Corp.*,
137 F.3d 109 (2d Cir. 1998) (*Leibovitz II*) ...................................45, 47

iv

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

*Leibovitz v. Paramount Pictures Corp.*,
    948 F. Supp. 1214 (S.D.N.Y. 1996) (*Leibovitz I*)................................45

*Mattel, Inc. v. MCA Records, Inc.*,
    296 F.3d 894 (9th Cir. 2002) ...............................................................58

*Mattel, Inc. v. Walking Mountain Prods.*,
    353 F.3d 792 (9th Cir. 2003) .........................................................22, 35

*Monge v. Maya Magazines, Inc.*,
    688 F.3d 1164 (9th Cir. 2012) ......................................................passim

*Oracle Am., Inc. v. Google LLC*,
    886 F.3d 1179 (Fed. Cir. 2018 ) .........................................................34

*Paramount Pictures v. Axanar Prods.*,
    2:15-CV-09938-RGK-E, 2017 WL 83506 (C.D. Cal. Jan. 3, 2017)...........44, 53

*Penguin Random House LLC v. Colting*,
    270 F. Supp. 3d 736 (S.D.N.Y. 2017) ..................................................56

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ......................................................passim

*Price v. Sery*,
    513 F.3d 962 (9th Cir. 2008) ...............................................................50

*Qualitex Co. v. Jacobson Prods. Co.*,
    514 U.S. 159 (1995)....................................................................61, 62

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989) ...........................................................58, 59

*Romm Art Creations Ltd. v. Simcha Int'l, Inc.*,
    786 F. Supp. 1126 (E.D.N.Y. 1992) ....................................................62

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ......................................................passim

# TABLE OF AUTHORITIES
## (Cont.)

Page(s)

*Sofa Entm't, Inc. v. Dodger Prods., Inc.*,
  709 F.3d 1273 (9th Cir. 2013) ....................................................22, 35

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)........................................................................49

*TCA Television Corp. v. McCollum*,
  839 F.3d 168 (2d Cir. 2016) ...............................................34, 36, 37

*Twentieth Century Fox Television v. Empire Distrib., Inc.*,
  875 F.3d 1192 (9th Cir. 2017) .......................................................58

*Ty, Inc. v. Publ'ns Int'l Ltd.*,
  292 F.3d 512 (7th Cir. 2002) ..........................................................55

*United States v. Ogles*,
  440 F.3d 1095 (9th Cir. 2006) (*en banc*).......................................50

*VHT, Inc. v. Zillow Grp.*,
  981 F.3d 723 (9th Cir. 2019) ...............................................41, 42, 51

**STATUTES**

15 U.S.C. § 1127 ...............................................................................61

17 U.S.C. § 106(2) ...............................................................32, 33, 56

17 U.S.C. § 107 .........................................................................passim

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1338 .................................................................................1

28 U.S.C. § 1367 .................................................................................1

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

OTHER AUTHORITIES

3 Nimmer on Copyright § 13.05[A][4] (1993) ........................................................51

Fed. R. App. P. 4(a)(1)(A) ...................................................................................1

Pierre Leval, *Campbell* As Fair Use Blueprint, 90 Wash. L. Rev. 597 (2015) .......40

Pierre Leval, Fair Use: A Ramble through the Bramble, NYU Proving IP
    Symposium, May 16, 2019, video available at
    https://www.youtube.com/watch?v=OGky_yG8dV8 (last accessed
    August 4, 2019)..................................................................................................40

Pierre Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105 (1990)..........28

S. Rep. No. 94-473, p. 65 (1975) ...........................................................................51

## I.  JURISDICTIONAL STATEMENT

The district court had jurisdiction over the claims of the Amended

Complaint—which included claims for federal copyright and trademark

infringement—under 28 U.S.C. §§ 1331, 1338, and 1367.  ER666-96.  The district

court entered final judgment against Plaintiff-Appellant Dr. Seuss Enterprises, L.P.

("DSE") on all claims.  ER1-2.  This Court has jurisdiction over this appeal under

28 U.S.C. § 1291.

The district court entered final judgment on March 26, 2019.  ER1-2.  DSE

then filed its notice of appeal, also on March 26, 2019.  ER94-102.  This appeal is

timely under Federal Rule of Appellate Procedure 4(a)(1)(A).

## II.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Did the district court err by determining that Defendants' book *Oh

The Places You'll Boldly Go!* ("*Boldly*") was a fair use of DSE's copyrighted

works, granting Defendants' motion for summary judgment of copyright fair use,

and denying DSE's motion for summary judgment of copyright infringement?

2.     Did the district court err by granting Defendants' motions for

judgment on the pleadings and summary judgment rejecting DSE's trademark

infringement claims?

## III.  RELEVANT STATUTORY PROVISIONS

Under Circuit Rule 28-2.7, pertinent statutory provisions are contained in an

addendum to this brief.

## IV.   STATEMENT OF THE CASE

### A.   Plaintiff DSE

DSE owns the copyrights and other intellectual property rights in the works of the late Theodor S. Geisel, the author and illustrator of the books written under the pseudonym "Dr. Seuss" ("Dr. Seuss").  ER493-618; ER209-29; ER878; ER347-87.  Dr. Seuss wrote and illustrated the relevant works: *Oh the Places You'll Go!* ("*Go!*"); *How the Grinch Stole Christmas!* ("*Grinch*"); and *The Sneetches and Other Stories* ("*Sneetches*") (collectively, the "DSE Works").  ER739-64.  The DSE Works are registered for copyright with the Copyright Office and all copyrights remain in force.  ER493-618; ER209-29; ER347-87.

Dr. Seuss's books are marketed to both children (the readers) and adults (who buy the books and often read them to the children).  ER906.  Some of Dr. Seuss's books, like *Go!*, are intended to be read by older teenagers and adults, and are marketed to both age groups.  ER906; ER1188; ER1273; ER1277-80; ER1506-19.  *Go!* is DSE's best-selling book, and a very popular gift for graduating college and high school seniors.  ER886; ER890; ER1273-80; ER1507; ER1507; ER 1516-18; ER1520-76.  Every year during graduation season, *Go!* is the number-one book on *The New York Times* Best Sellers list.  ER1187-88; ER890.

DSE publishes reissues and updates of the iconic Dr. Seuss books, including the DSE Works.  ER883; ER889-90; ER1192; ER1203-11.  DSE also operates a

2

robust licensing program, where DSE authorizes and oversees the creation of new works under the Dr. Seuss brand. ER879-81; ER893-94; ER911; ER928; ER938; ER1282-1302; ER1203-11. These licensed new works include: books in Dr. Seuss's style that often incorporate his original artwork or characters; fine art sold in high end galleries; toys; video games; stage productions; and major motion pictures. ER883-84; ER1186-1202; ER1212-71; ER1282-1302; ER1483-1519. In 2017, a market industry research firm named Dr. Seuss the top licensed book brand. ER490-92.

DSE has licensed many published works that incorporate many elements of the original Dr. Seuss books. ER429; ER432-34; ER888-89; ER1217-69. These authorized works include *There's No Place Like Space!* (a *Cat in the Hat* book showing kids in rocket ships in outer space) and derivatives based on *Go!*, such as *Oh, The Things You Can Do That Are Good For You!*; *Oh, Baby! Go, Baby!*; *Oh, the Places I'll Go! By ME, Myself*; *Oh, Baby, the Places You'll Go!*; and *Oh, the Places I've Been! Journal*. ER888-89; ER1217-69; ER1315-ER1500.

DSE also licenses works where it collaborates with other intellectual property holders. The resulting works combine Dr. Seuss's creative elements with the collaborator's properties. The resulting collaborations appeal to both audiences for Dr. Seuss and for the collaborator's works. ER897-98; ER900; ER903-05; ER908; ER931. For example, DSE and The Jim Henson Company collaborated on

3

*The Wubbulous World of Dr. Seuss*, a television and book series that featured "muppetized" Dr. Seuss characters and non-character "creative elements." ER1577-1770; ER897; ER905. Other collaborative works include: *Grinch Panda Pop*, a digital game that combines Jam City's Panda character with the Grinch character; figurines that combine Funko Inc.'s distinctive toy designs with Dr. Seuss characters; and a line of clothing combining Comme des Garçons' well-known heart design alongside *Grinch* artwork. ER900; ER905-06; ER931-33; ER1282-86; ER1299; ER1301-02; ER1771-1840. Other collaborations are in the works. ER908.

DSE has received numerous offers from intellectual property owners wishing to work with DSE on a collaboration. ER913. DSE selectively and carefully vets the proposed collaborator before deciding whether to pursue a collaboration. ER893-94; ER911.

## B.    Defendants and the Genesis of *Boldly*

Defendant David Gerrold wrote *Star Trek* television episodes for Paramount Television, which formerly produced the series. ER284. In May 2016, he suggested to fellow "Trekkie" Defendant Glenn Hauman, owner of Defendant ComicMix, that "if we could get a license, we should do a Star Trek Primer." ER388-89. To make their ersatz *Star Trek* story more salable, they considered taking the familiar illustrations and prose/poetry styles of other well-known books,

4

but ultimately landed on *Go!*. ER388-98; ER1042-47. In May 2016, Hauman e-mailed Gerrold a mock-up of a proposed *Boldly* cover, which he copied directly from *Go!*, stating: "Well, if you're not doing this, I am." ER390-93. Gerrold replied, "I am SOOO in!" ER1043. Hauman testified that he selected the title (and title font) of *Boldly* to "evoke" both *Go!* and *Star Trek*. ER112-15; ER169; ER186-87.

Hauman selected Defendant Ty Templeton to illustrate *Boldly* because he is adroit at copying other illustrators' works. ER260; ER165; ER172; ER178. In June 2016, Hauman invited Templeton to join the *Boldly* project, indicating that "this would be Seuss-style TOS [*Star Trek: The Original Series*] backgrounds," and that "we're going to want the cover and at least a background art piece for promotions, as well as be able to use the cover for posters, mugs, and all the merchandise that will push this thing over the top." ER413-14. Templeton responded, "Holy CRAP that's a cool idea. The title is like printing money. I'm totally in." ER413.

Defendants copied from the DSE Works, primarily *Go!*, to create *Boldly*, and the more they worked on *Boldly*, the more they took from Dr. Seuss. ER186-87; ER199-203; ER246; ER249; ER258-60; ER270-71; ER 273; ER276-77; ER319; ER399-400; ER410-11; ER430-31; ER750-60; ER761-67; ER1130-37. Gerrold first wrote a draft "from scratch" that "focus[ed] on the *Star Trek* aspect

5

more than the specific parallels with anything in the Seuss book." ER308; ER1055-1103. He then changed his mind and ordered a copy of *Go!* because he "want[ed] to parallel it as close as [he] can." ER304; ER399-400. Hauman also scanned to Gerrold a copy of *Go!* and Gerrold rewrote *Boldly*'s text to closely match *Go!*'s text. ER399-400; ER1055-1103. Hauman also created a side-by-side comparison of *Go!*'s and *Boldly*'s text in order "to try and match the structure of *Go!*." ER1130-37.

*Boldly* was intentionally written to tell the same uplifting story that *Go!* tells. ER421. Templeton told the other Defendants that *Go!*'s point "is that life is an adventure but it WILL be tough and there WILL be setbacks, and you should not despair of them," which is "why *Go!* resonates so much, especially as a graduation gift for folks who grew up reading Seuss." ER421. Templeton stated that "we have to keep to that sentiment to make the parody and spirit work." ER421.

Templeton testified as to his process for illustrating *Boldly*:

> I would have the original book open to what I was
> looking at. I would rough out the positions the characters
> are in. After I was satisfied with the position that the
> characters are in being similar enough to evoke the
> original source material, I would render them as carefully
> as I could.

ER259-60. Templeton further testified that his "copying" of one page took him "about seven hours" because he "painstakingly attempted to make" his illustration "nearly identical" to Seuss's. ER258-59; ER276-77. Even though he

"meticulously tr[ied] to reproduce as much of the [Dr. Seuss] line work" as he could, his first drafts were not "close enough" for Hauman, who directed him to "go closer to" *Go!*.  ER259-260; ER270-71; ER273; ER409-11.  Templeton admitted that "I did, in fact, slavishly copy from Seuss."  ER410.

Defendants also designed a cover for *Boldly* that looked like an authorized Dr. Seuss-branded book: its title was a variation on the *Go!* title, just as with many authorized *Go!* derivatives; it used Dr. Seuss's illustration style, as do DSE's authorized books; and it even used the same font (based on Dr. Seuss's own hand-lettering) that DSE uses on those books.  ER175; ER181; ER186-87; ER189; ER130; ER136; ER196-203; ER761-69; ER430-31; ER146-47.  As Defendants intended, the final version of *Boldly* had the overall look and feel of a true Dr. Seuss book and copied many Dr. Seuss drawings.  ER437; ER410-11; ER139; ER149; ER155; ER 158; ER739-60.

## C.    Defendants' Plans to Publish and Sell *Boldly*

Defendants knew that DSE licenses books like *Boldly*, but never sought a license from DSE.  ER304-05; ER320; ER343-345; ER389-393; ER426; ER1049. Hauman instead hoped DSE would retroactively reward Defendants for their unauthorized creation.  ER343-45; ER1055-1103; ER478-84.  In July 2016, Hauman wrote that, despite the legal risk, "it's more likely that [DSE will] see the

product and want to publish it themselves and give us a nice payday for doing so."
ER343-45; ER1055-1103; ER478-84.

Concurrently, Hauman contacted a merchant at ecommerce retailer
ThinkGeek to assess ThinkGeek's interest in handling "merchandise, printing and
distribution" for *Boldly*. ER420-24. ThinkGeek conditionally ordered 5,000
copies of *Boldly*. ER1178-81.

On August 31, 2016, Defendants launched a fundraising campaign on
Kickstarter.com to pay for *Boldly*'s production and fixed costs. ER443-52.
Allison Adler, an editor at publisher Andrews McMeel Publishing ("AMP"), saw
the Kickstarter page, reached out to Defendants, and subsequently ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ ER1150-58.

Hauman and Adler exchanged e-mails about AMP's proposal, during which
Hauman disclosed ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ ER453-54; ER1159-73. On September 21, 2016,
the parties reached a "letter of agreement" on the principal terms. ER455-58. ██

████████████████████████████████████████

████████████████████████████████████████

ER1174-81.

### D. DSE's Demand Letters and Defendants' Reaction

DSE learned about *Boldly* from viewing Kickstarter. ER443-52; ER470-72

It then sent Defendants a September 28, 2016 cease-and-desist letter. ER470-72.

Because Defendants did not respond that they would cease infringing, DSE sent

them two more letters in October 2016, and sent a DMCA takedown notice to

Kickstarter. ER266-67; ER314-15; ER361-62; ER265; ER370; ER469-77;

ER1860-64.

AMP withdrew from the project, and Defendants returned to ThinkGeek,

asking it to handle a direct sale publication. ER363; ER459-64; ER485-87.

Hauman reassured the *Boldly* team that even if Defendants had to pull the order

from ThinkGeek for legal reasons, "they'll have new orders in time for school

*graduations*." ER465-66 (emphasis added).

Because Defendants did not agree to stop work on *Boldly* even after

receiving DSE's letters, DSE filed its complaint on November 10, 2016. ER699-

717. Shortly after being served, Gerrold suggested to Templeton that re-drawing

the illustrations could be a "way out" of the lawsuit:

9

> A lot of our artwork is based on Dr. Seuss's artwork.
> What if we did whole new artwork, not specifically based
> on any individual drawing by Seuss, but close enough to
> his style to match the text. If we replace the stuff that's
> too dead on – yes, its extra work for Ty [Templeton], but
> it really weakens their case.

ER410. Templeton responded that "[i]n my original layouts for our book, I was

ignoring the layouts for [*Go!*] and just trying for a Suessian [sic] art style."

ER410. Templeton offered to revert to those layouts if it "solves problems," but

Defendants never took this step. ER410.

Hauman also notified ThinkGeek about DSE's lawsuit. ER488-89. In

February 2017, ThinkGeek contacted Hauman for an update, saying it would

"LOVE to be able to offer [*Boldly*] for Graduation." ER467-68. Hauman replied:

"I would LOVE to offer it to you, but the lawsuit grinds on." ER467-68.

## E. *Go!* Illustrations Used in *Boldly*

Defendants copied 14 of *Go!*'s 24 pages to illustrate *Boldly*. ER943-70;

ER1057; ER1104-29. Defendants also copied illustrations from *Grinch* and two

stories in *Sneetches*. ER971-1041; ER935-37. For example:

10

| Dr. Seuss Work | Infringing Work |
|:---:|:---:|







ER944; ER955; ER958-59; ER981; ER1012; ER1022; ER1110-11; ER1114; ER1117; ER1119; ER1122-23.

### F.    DSE Trademarks Used in *Boldly*

*Boldly* uses three DSE trademarks: (1) the title OH, THE PLACES YOU'LL GO!; (2) the Seussian style of illustration; and (3) the Seussian font (which is intended to resemble Dr. Seuss's unique hand-drawn lettering) (the "DSE Marks"). ER671-72.  DSE has common law rights in all three marks, and owns U.S. Registration No. 5,099,531 for the word mark OH, THE PLACES YOU'LL GO! for various goods.  ER671-72.  Every new work based on *Go!* that DSE authorizes uses a cover with illustrations closely similar to the Dr. Seuss originals, the Seussian font, and a title that is either *Oh the Places You'll Go!* or a recognizable variation thereof.  ER1344; ER1377; ER1394; ER1403; ER1484.  As a result, a book with those elements appears to consumers to be a licensed Dr. Seuss-brand book.  Defendants admitted they intentionally incorporated all these elements into

*Boldly*'s cover so that when *Boldly* was placed on sale, it would "match the look and feel of Seuss books."  ER297-98; ER438-42; ER1139-49.

DSE submitted unrebutted expert survey evidence that Defendants' copying of Dr. Seuss's distinctive illustration style and font would likely confuse potential buyers of *Boldly* into thinking *Boldly* was an authorized Dr. Seuss book.  ER770-872.  The survey used a Test Group, who saw *Boldly*, and a Control Group, who saw an altered version of *Boldly* created by an artist retained by DSE (the "Control Work").  ER777-86.  The Control Work used the identical title, story, and prose as *Boldly*, but employed a non-Seussian illustration style and a non-Seussian font on the cover.  ER777-86.

While sizable portions of both the Test and Control Groups were confused into believing the works they saw were associated with or authorized by DSE, significantly more confusion occurred for respondents who saw the unaltered *Boldly*.  ER789.  The expert thus concluded there was a "net rate of 24.0% of respondents confusing *Boldly* with Seuss due to the illustration style and font[, which] confirms that there is a significant degree of association of the illustration style and font with Seuss."  ER789; ER815-16.

14

### G.     Procedural History

DSE asserted claims for copyright infringement, trademark infringement, and unfair competition.  ER699-717.  Defendants moved to dismiss all claims on copyright and trademark fair use grounds.  ER697-98.  On June 9, 2017, the court denied Defendants' motion with respect to DSE's copyright claims, but dismissed the trademark and unfair competition claims with leave to amend.  ER74-93.  On the first copyright fair use factor, the court found *Boldly* to be a transformative work, "combin[ing]into a completely unique work the two disparate worlds of Dr. Seuss and Star Trek."  ER81.  The court also found that, although "*Go!*'s rhyming lines and striking images, as well as other Dr. Seuss works, are often copied by *Boldly* . . . the copied elements are always interspersed with original writing and illustrations that transform *Go!*'s pages into repurposed, Star-Trek–centric ones."  ER81.  DSE then filed an amended complaint.  ER666-96.

Defendants moved to dismiss the amended complaint, again on fair use grounds.  ER664-65.  On December 17, 2017, the court denied the motion in full.  ER50-73.  On the first through third copyright fair use factors, the court adopted its previous analysis.  ER55.  But the court found that, at this stage, the fourth factor (market impact) favored DSE because "there is a potential market for a literary mash-up involving Plaintiff's books; such a market would not be unlikely based on Plaintiff's past licensing programs.  Defendant's production of *Boldly* may result in

15

an adverse impact on Plaintiff's derivative market and the Court therefore finds there is potential harm to the market for Plaintiff's derivative works." ER58. It concluded that "after again weighing the [copyright] fair use factors, the Court finds Defendants' [copyright] fair use defense fails as a matter of law." ER58.

Defendants filed an answer and motion for partial judgment on the pleadings, seeking dismissal of DSE's trademark claims on First Amendment grounds. ER619-63; ER725. On May 21, 2018, the court partially granted Defendants' motion, dismissing DSE's trademark claims based on using *Go!*'s title. ER41-49.

Subsequently, the parties filed cross-motions for summary judgment on the copyright claims, and Defendants sought summary judgment on the trademark claims. ER732-35.

On March 12, 2019, the court granted Defendants' summary judgment motion and denied DSE's summary judgment motion. ER3-40. The court found that *Boldly*'s use of Dr. Seuss's works was a copyright fair use. ER16-35. On the first factor, the nature and character of the use, the court repeated its ruling that *Boldly* was "highly transformative" despite its non-parodic and commercial nature. ER19. The court asserted that, while Defendants "certainly borrowed from *Go!* – at times liberally – the elements borrowed were always adapted or transformed." ER19. It also ruled that the two works do not have the same purpose and function

16

because "[w]hile *Boldly* may be an illustrated book with an uplifting message . . . it is one tailored to fans of *Star Trek's* Original Series." ER19.

The court found that the second factor, the nature of the copyrighted work, "slightly favors" DSE due to the highly creative nature of the DSE Works. ER20. It repeated its ruling that the third factor, the amount and substantiality of *Boldly*'s use of the DSE Works and whether such use was reasonable, favored Defendants because they "took no more than was necessary for [their] purposes, i.e., a 'mash-up' of *Go!* and *Star Trek*." ER21.

On the fourth factor, the court noted that "the parties hotly contest the inferences that can be drawn from the developed record." ER25. Although fair use is an affirmative defense, the court held that because *Boldly* was "transformative," the burden shifted to DSE to prove by the "preponderance of the evidence" that *Boldly*—which had not been published—is "likely substantially" to harm the market for *Go!* or its derivatives. ER25.

The court acknowledged DSE's active licensing of derivative works based on the DSE Works and its collaborations on works that intermingle Dr. Seuss's and a collaborator's intellectual property. ER31. The court also stated "it is clear" that Defendants intended *Boldly* to compete with *Go!* in the graduation gift market, and "it is certainly conceivable that some would-be purchasers of *Go!* would instead purchase *Boldly* for a Trekkie graduate." ER31.

17

Nonetheless, the court concluded *Boldly* would not "substantially" harm the market for the DSE Works or their derivatives, and that the fourth factor "favors neither party." ER34. It found that *Boldly* would not compete in *Go!*'s market "as a children's book," even though it earlier found as indisputable fact that *Go!* is written for and marketed to adults and older teenagers. ER29. It found no impact on *Go!*'s graduation market because *Go!* is DSE's best-selling book, while Defendants only planned an initial 5,000 book printing of *Boldly*. ER31. It found that DSE had not shown that *Boldly*, if published, would cause DSE to lose licensing opportunities or revenues from derivative markets of *Go!*. ER32. Although the law requires it, the court did not consider whether sales of *Go!* or derivatives would be affected if everyone—not just Defendants—were allowed to take so extensively from Dr. Seuss books for their own mash-up efforts. ER3-40.

Finding that the balance of the fair use factors favored Defendants, the court held that *Boldly* was a copyright fair use as a matter of law and entered judgment against DSE on its copyright claims. ER35. The court also dismissed DSE's remaining trademark and unfair competition claims on grounds discussed in the trademark argument section below. ER35-39.

DSE appealed. ER94-102.

## V.    SUMMARY OF ARGUMENT

The district court erred as a matter of law in granting summary judgment of copyright fair use to Defendants.  The undisputed record shows that each of the four statutory fair use factors favors DSE.  The first factor, the purpose and character of Defendants' use of the DSE Works, favors DSE because the use was exploitative and intended to grab the attention of potential buyers, not transformative.  *Boldly* does not parody or comment on, criticize, or teach about *Go!* or Dr. Seuss.  Defendants added no new purpose to the many Dr. Seuss drawings they meticulously copied.  They merely aped the purpose of *Go!*: entertaining the readers (mostly graduates starting out in the world) with an uplifting story.  Populating Dr. Seuss's imaginative illustrated worlds settings with *Star Trek* characters and props, and adding some Seuss-like doggerel, did not result in any transformation favored by the Copyright Act; it simply infringed two different copyright holders' rights.

The second factor, the nature of the copyrighted work, favors DSE, as Dr. Seuss's unique creative works are entitled to maximum copyright protection.  So does the third factor, the amount and substantiality of what was taken, because defendants copied extensively from Dr. Seuss and took many imaginative drawings that were central to his books.

The fourth factor, harm to DSE's potential markets, also weighs decisively against fair use. The district court erred in shifting the burden on this factor to DSE; fair use is an affirmative defense, and its proponent must show absence of market harm even if the challenged use is transformative. Defendants failed to show there was no market harm, so the fourth factor favors DSE as a matter of law.

In addition, there was overwhelming record evidence showing likely market harm. The court erred by limiting its consideration to the potential effects of *Boldly* <u>itself</u> on *Go!*'s markets. The fourth factor requires consideration of whether harmful effects would follow if *everyone* were allowed to copy from Dr. Seuss in the same way and likewise targeted the primary graduation market for *Go!*. The undisputed facts showed that such widespread taking would significantly harm both the direct and derivative markets for *Go!*.

DSE showed that *Boldly* was intended to appeal to a subset of *Go!*'s existing graduation market audience, that DSE actively exploited derivative markets that included mash-up type collaborations with other copyright owners, and that DSE would consider a collaboration with *Star Trek*'s rightsholders. DSE further showed that allowing widespread mash-ups of *Go!* would permit specialized pop culture versions of *Go!* to substitute for buying the original book. It would also usurp DSE's active derivative licensing market and deter others from seeking to do mash-up collaborations with DSE.

20

Because all four fair use factors decisively favor DSE's, the Court should reverse the judgment below as to fair use, direct entry of a liability judgment in DSE's favor on copyright infringement, and remand for a determination of DSE's damages.

The district court also erred in dismissing or entering summary judgment on DSE's trademark and unfair competition claims. DSE's book title *Oh, The Places You'll Go!* functions as a source-identifying mark, which is reinforced through the numerous derivative works originated by DSE that are based on *Go!* and have titles that are variations on the original. DSE is entitled to show a jury that consumers view books with such titles as originating with or approved by "Dr. Seuss." This Court has rejected the legal ground on which the district court dismissed this claim: that use of a trademark alone cannot be explicitly misleading for purposes of First Amendment analysis. The district court also erred in holding categorically that Dr. Seuss's unique illustration style and font cannot function as source-identifying trademarks. The Court should therefore vacate and remand for trial on these claims.

21

## VI.   ARGUMENT

### A.   Standard of Review

This Court reviews the district court's grant of summary judgment to Defendants de novo, viewing the evidence in the light most favorable to DSE, the non-moving party.  *Mattel, Inc. v. Walking Mountain Prods*, 353 F.3d 792, 799 (9th Cir. 2003).  It reviews de novo whether Defendants' use of Dr. Seuss's copyrighted material was a fair use.  *Sofa Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1277 (9th Cir. 2013).  Where fair use reaches this Court on appeal from a summary judgment order, the relevant historical facts are not disputed, and the parties contest only the conclusions to be drawn from the facts, this Court may decide the issue as a matter of law, without remand for further fact-finding. *Harper & Row v. Nation Enter.*, 471 U.S. 539, 564 (1985); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1175 (9th Cir. 2013).  This Court also reviews de novo the grant of a Rule 12(c) motion for judgment on the pleadings.  *Harris v. Cty. of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012).

### B.   *Boldly* Is an Infringement of DSE's Copyrights, Not a Fair Use

In this case, it is not disputed that that DSE owns the copyrights to *Go!* and the other Dr. Seuss works that Defendants copied to create *Boldly*.  Nor is it disputed that Defendants accessed and copied substantial portions of these works in *Boldly*, more than is needed to establish a claim of direct copyright infringement.  But for the court's incorrect ruling that *Boldly* was a fair use, DSE

22

would be entitled to summary judgment on its copyright infringement claim, an injunction against *Boldly*, and recovery of statutory or actual damages. The copyright claim therefore turns on whether *Boldly* is a fair use of *Go!* and the other DSE Works that Defendants copied.

Some fair use cases are close and require an inquiry into the "metaphysics of the law." *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1171 (9th Cir. 2012). As shown below, this is not a close case. All four statutory fair use factors decisively favor DSE. The purpose and character of the Dr. Seuss drawings and other expression copied in *Boldly* have not been transformed with new purpose or meaning. To the contrary, *Boldly* has the same purpose as *Go!* does: to entertain the reader with an uplifting story that teaches that obstacles can be confronted and surmounted. *Boldly*'s commercial nature further cuts against fair use. The second and third factors favor DSE too. Dr. Seuss's unique creative illustrations warrant maximum copyright protection, and Defendants copied too much—both qualitatively and quantitatively—from the DSE Works.

On the fourth factor, DSE also prevails. It is presumed that the publication of *Boldly*, a commercial work, would harm the direct and derivative markets for *Go!*. Even if *Boldly* had made transformative use of *Go!*, fair use is an affirmative defense, and Defendants failed to showing that if everyone were allowed to copy from Dr. Seuss as they did, there would be no harm to DSE's markets. In fact,

23

DSE presented overwhelming evidence that allowing unauthorized mash-ups of

*Go!* with other pop culture properties would harm both sales of *Go!* to its primary

graduation market and DSE's ability to collaborate on authorized mash-ups

combining *Go!* with another copyrighted work. Accordingly, *Boldly* is an

infringement of *Go!* and not a fair use.

### 1. The Four Statutory Fair Use Factors

"[F]air use is an affirmative defense." *Campbell*, 510 U.S. at 590. If the

proponent of fair use carries its burden of showing fair use, its conduct is not

considered a copyright infringement. 17 U.S.C. § 107.

Section 107 of the Copyright Act codifies fair use principles. *Campbell v.*

*Acuff-Rose Music, Inc.*, 510 U.S. 569, 576, 590 (1994). In a preamble to § 107,

Congress gave, as examples of fair use purposes, "criticism, comment, news

reporting, teaching . . . scholarship or research." It then set out four non-exclusive

factors that courts must consider when a fair use defense is raised:

> (1) the purpose and character of the [defendant's] use,
> including whether such use is of a commercial nature
> or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in
> relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or
> value of the copyrighted work.

17 U.S.C. § 107. These factors are non-exclusive and were not intended to limit "the common-law tradition of fair use adjudication." *Campbell*, 510 U.S. at 577.

After determining whether each of the factors favors or disfavors a finding of fair use, the court must weigh the results together, "in light of the purposes of copyright." *Id.* at 578.

### 2. The District Court Ignored the Most Relevant Precedent: This Court's Decision in *DSE v. Penguin Books*

This case is remarkably close to a controlling precedent of this Court— never mentioned in the opinion below—that rejected a fair use claim involving a Dr. Seuss book.

In *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997), the defendant published a purported parody of Dr. Seuss's *The Cat in The Hat!*, entitled *The Cat NOT in the Hat!*, retelling the O.J. Simpson double murder trial with rhymes and illustrations in the Dr. Seuss style. Simpson was depicted on the cover of this book and in 13 illustrations as wearing the original Cat's battered stovepipe hat. *See* illustration at 109 F.3d 1405. The defendant claimed that the book was a fair use of the original Dr. Seuss book.

This Court affirmed a preliminary injunction against the book, analyzing the fair use claim against the principles of *Campbell*. It found that defendant's book was not a parody or other transformative criticism and that defendant appropriated Dr. Seuss's illustrations and styles solely "'to get attention' or maybe even 'to

25

avoid the drudgery in working up something fresh.'" *Id*. at 1401 (quoting *Campbell*, 510 U.S. at 580). It further found Dr. Seuss's book to be creative, and defendants to have taken "the highly expressive core" of that book. *Id*. at 1402. It found that there was a presumption of market harm from the commercial nature of the defendants' book, and that the burden of showing no market harm fell on the defendants, who "must bring forward favorable evidence about relevant markets." *Id*. at 1403. Since the defendants did not present such evidence, the fourth factor also was counted against fair use. *Id*.

The present case strongly resembles *Penguin Books*. *Boldly*, like *The Cat NOT in the Hat!*, is not a parody or other form of criticism. The district court stated that *Boldly* "combined into a completely unique work the two disparate worlds of Dr. Seuss and Star Trek." ER81. But *The Cat NOT in the Hat!* also combined the disparate worlds of Seuss and O.J. Simpson, into a unique work, *Penguin Books*, 109 F.3d at 1402-03, yet this Court held that the combination was not transformative but instead deployed the Seuss work "to simply retell the Simpson tale," *id.* at 1401.

Likewise, the district court stated that "the copied elements [of Seuss] are always interspersed with original writing and illustrations that transform *Go!*'s pages into repurposed, *Star-Trek*–centric ones." ER19. But *The Cat NOT in the Hat!* also combined the copied elements of Dr. Seuss with original writing and

26

illustrations that were O.J. Simpson-centric ones, yet the Court held that this showed "no effort to create a transformative work with 'new expression, meaning, or message.'" *Id.* at 1401 (quoting *Campbell*, 510 U.S. at 578).

This Court found in *Penguin Books* that the third factor, the amount and substantiality of the use, favored DSE because the defendants had 13 illustrations depicting O.J. Simpson in the Cat's famous hat, but provided no justification for this level of taking. *Id.* at 1402. Here, the third factor cuts even more sharply against Defendants, who copied far more extensively from *Go!* and other Dr. Seuss works, with no better justification. Finally, this Court held in *Penguin Books* that the commercial nature of *The Cat NOT in the Hat!* created a presumption of harm to DSE's markets, which the defendants did not rebut. As shown below, the same is true here: *Boldly* is a commercial work, and Defendants did not rebut the presumption of market harm that arises from this fact.

### 3. *Boldly* Does Not Present a "Preamble Use"

Fair use analysis starts with whether the challenged use falls within Congress's examples of potential fair use in the preamble to § 107. *Campbell*, 510 U.S. at 578-79 ("[T]he enquiry here may be guided by the example given in the preamble to § 107; . . . that parody, like other comment or criticism, may claim fair use under § 107."); *Monge*, 688 F.3d at 1173. A use that falls within or is analogous to a statutory example is more likely to be a fair use, although other

27

facts may defeat the defense. *See, e.g.*, *Harper & Row*, 471 U.S. at 561; *L.A. News Serv. v. Reuters Television Int'l*, 149 F.3d 987, 993 (9th Cir. 1998).

*Boldly* does not make a "preamble use" of the copied works. It is not a parody of *Go!*, as the court correctly found. ER80-81; ER22. It does not present any other kind of criticism or commentary on either *Go!* or Dr. Seuss. ER80-81. It does not report news about the book or copy portions in order to teach about them. While not dispositive, that *Boldly* is neither within nor remotely analogous to these traditional examples counts against fair use here.

    **4.    The "Purpose and Character" Of *Boldly's* Use of *Go!* Is Not Transformative and Weighs Against Fair Use (First Factor)**

    **a.    Development of the Transformative Use Inquiry**

The first statutory fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature . . . ." 17 U.S.C. § 107(1). Under *Campbell*, the concept of "transformative use" has become central to first-factor analysis. 510 U.S. at 579. The first factor focuses on "whether, and to what extent, the challenged use is '*transformative*.'" *Campbell*, 510 U.S. at 579 (quoting Pierre Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105 (1990)) (emphasis added). The question is whether the new work "adds something new, with a further purpose or different character, altering the first [with] new expression, meaning or message." *Id* at 580.

*Campbell* applied this new analysis to a rap parody of a popular rock song. It found that parody, as a well-established form of criticism through comic effect or ridicule, had a transformative justification because it was necessary to use "some elements" of the prior composition to create a new work that in part comments on the original work. *Id.* at 580. *Campbell* contrasted parody with satire and other non-critical uses:

> [If] the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, looms larger.

*Id.*

### b. Mash-ups Are Not Automatically Transformative Uses

The district court found that Boldly was not a parody (ER81) and did not view it as containing criticism of *Go!*, Dr. Seuss, or anything else (ER3-40). Instead, it characterized Boldly as a mash-up. ER88. Under the dictionary definition cited by the court (ER80), a mash-up is "something created by combining elements from two or more sources; such as . . . (b) a movie or video having characters or situations from other sources." "Mash-up," Merriam Webster, https://www.merriam-webster.com/dictionary/mash-up (last visited August 4, 2019). The court's decision incorrectly yields a result that all mash-ups without

29

any critical commentary are inherently transformative, no matter how much of the original material is taken from both works. This is not and cannot be the law, as infringements do not become excusable simply because the defendant takes from two authors rather than one.

The court acknowledged that Defendants "borrowed heavily" from the DSE Works, but its description of *Boldly* as merely "us[ing] Go!'s illustration style and story format as a means of conveying particular adventures and tropes from the Star Trek canon" (ER81) does not convey the true extent of *Boldly*'s copying. Defendants did not simply draw in the Dr. Seuss style. Rather, in the words of their own illustrator, they "slavishly cop[ied]" the illustrations of *Go!* down to minute details, with the goal of making them appear as much like the originals as possible, while altering aspects solely to insert Star Trek characters, references and props.

| Dr. Seuss Work | Infringing Work |
|:---:|:---:|
|  | |



ER943-70; ER1104-29; ER971-1041.

In fact, *Boldly* copies material parts of 14 separate illustrations of *Go!* (a 24-page book), as well as drawings from *Grinch* and *Sneetches*. ER943-70; ER1057; ER1104-29; ER971-1041; ER935-37.

That *Boldly* is not a parody or other form of commentary or criticism strongly suggests that *Boldly* is not meaningfully transformative. While a parody must use portions of the original "to make its [critical] point," *Campbell*, 510 U.S. at 581, the only apparent points of a mash-up without criticism or comment are the novelty of juxtaposing characters and settings from two different "universes" and

avoiding the effort of creating one's own new characters and worlds. This is not a transformation as intended by *Campbell*. Indeed, the only change that the district court identified was one that did not alter Dr. Seuss's work with "new [further] expression, meaning or message," *Campbell*, 510 U.S. at 579: Defendants merely "combined . . . the two disparate worlds of Dr. Seuss and Star Trek," and turned Dr. Seuss's drawings into "Star Trek-centric ones." ER81. Because *Boldly* is not meaningfully transformative, its extensive copying from *Go!* is indefensible. *Campbell*, 510 U.S. at 586-87 ("[T]he extent of permissible copying varies with the purpose and character of the use."); *Penguin Books*, 109 F.3d at 1402.

First factor analysis is also influenced by the fourth statutory factor, market harm, since most transformative uses occur in markets not typically licensed by owners, such as parody or criticism. *Campbell*, 510 U.S. at 592. A non-critical mash-up, however, does impact significant markets, because it simultaneously violates the derivative works rights of two copyright owners. 17 U.S.C. § 106(2). The court minimized the importance of derivative rights (ER20), but in today's entertainment and publishing world, they are among the most incentivizing sticks in the bundle of copyright. An author will write a book for little money because she hopes she will see a bigger payday if the rights are purchased for a movie. A studio will invest in making a film because it has the potential of becoming the foundation of a multi-film franchise and merchandizing opportunities.

32

Mash-ups fall squarely within these valuable derivative rights. Under § 106(2), two copyright owners have the right to jointly combine elements of their existing works to create a mash-up, which is a derivative work based on both originals. An unauthorized mash-up usurps the rights of both copyright owners to jointly exploit their properties.

In sum, the district court erred in ruling that substantial takings from two or more intellectual property franchises, mashed-up without any critical purpose, are inherently transformative. If this were true, then the fair use exception would swallow the copyright owners' exclusive rights to make their own derivative works. *Campbell* and other precedents make clear that the district court's approach is not the law.

### c. *Boldly* Does Not Have a Different Purpose from *Go!*

The court asserted that *Boldly* "is no doubt transformative," because it tells of the "strange beings and circumstances" of the *Star Trek* universe "through *Go!*'s communicative style and method." ER81. But "style and method" was not all that Defendants took from *Boldly*, as the court acknowledged that "*Go*'s . . . striking images *are often copied* by *Boldly*." ER81 (emphasis added). However, the court excused the extensive copying by stating that "the copied images are always interspersed with original writings and illustrations that transform *Go*!'s pages into repurposed, *Star Trek*-centric ones." ER81 (emphasis added); ER21-24.

33

This is not the law.  First, an infringer who adds some original material around extensively copied images does not thereby make a fair use of the images.  In *Penguin Books*, the defendants' *The Cat NOT in The Hat!* book dealt with a different subject (O.J. Simpson), had original verse in the "style" of Dr. Seuss, and used original illustrations in addition to copying Dr. Seuss's Cat and Hat images, 109 F.3d at 1401, yet this Court concluded that the book had no "new expression, meaning or message."  *Id.* (quoting *Campbell*, 510 U.S. at 578); *see also Monge*, 688 F.3d at 1176 ("[W]holesale copying [of photographs] sprinkled with written commentary . . . was at best minimally transformative.").

Second, transposing one work's characters into another work's illustrated settings—recontextualization without more—is not meaningfully transformative.  *Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179, 1201 (Fed. Cir. 2018) ("[M]oving material to a new context is not transformative in and of itself – even if it is a 'sharply different context.'" (quoting *TCA Television Corp. v. McCollum*, 839 F.3d 168, 181-83 (2d Cir. 2016))).  Such transposition provides none of the artistic or social benefit found in preamble uses such as parody or other criticism.  As Justice Kennedy said in his *Campbell* concurrence, while it would be "amusing to hear how [an] old tune sounds in a new genre . . . [i]f we allow any weak transformation to qualify as parody, however, we weaken the protection of copyright."  510 U.S. at 599 (Kennedy, J., concurring).

34

*A fortiori*, *Boldly* is not "highly transformative," as the district court thought. ER35. The "highly transformative" designation has been applied in only two settings, neither of which is applicable here: (1) works that are plainly parodies or critical commentary on the original, *see, e.g.*, *Mattel, Inc.*, 353 F.3d at 806; and (2) functional processes using copyrighted works as raw material, such as search engines allowing photographs scattered on the Internet to be located, *see, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165-67 (9th Cir. 2007), or a program allowing plagiarism to be detected in student papers, *see, e.g.*, *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009).

Third, *Boldly* does not "repurpose" *Go!* in any way relevant to fair use. While *Boldly* may have made Dr. Seuss's drawings "*Star Trek*-centric," *Boldly* serves the same specific entertainment purpose as *Go!* does. *See Campbell*, 510 U.S. at 579. The purpose of a second work should be clearly different from that of the original work; otherwise, it is likely unfair, because it supersedes the objects of the original. *Id.*

For example, use of short video clips of performances may be fair where used in a filmed biography, because the purpose of the use is to instruct, not to use the clips for their entertainment value. *See, e.g.*, *Sofa Entm't*, 709 F.3d at 1278-79; *Hofheinz v. A & E Television Networks,* 146 F. Supp. 2d 442, 444 (S.D.N.Y. 2001); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605,

35

610 (2d Cir. 2006). Conversely, takings of entertainment properties are non-transformative where the new work also has the primary purpose of entertaining in the same way and for the same reason as the original. In *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622 (9th Cir. 2003), *overruled on other grounds*, *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011), this Court affirmed a district order granting a preliminary injunction against a biographical film that used "video clips, photographs and music" of Elvis Presley. While some short clips were fairly used for "reference purposes" or to "explain their context in Elvis' career," *id.* at 628, others, played without much interruption, "serve[d] the same intrinsic entertainment value that is protected by Plaintiffs' copyrights" and were not transformative uses. *Id.* at 629 (emphasis added); *see also TCA Television Corp.*, 839 F.3d at 182-83 (interpolating "Who's on First" routine in dramatic play not transformative where used "to capture audience attention" and for same comedic purpose as original routine); *Castle Rock Entm't v. Carol Pub. Grp., Inc.,* 150 F.3d 132, 144 (2d Cir. 1998) (*Seinfeld* trivia book not transformative where book's purpose, like that of original *Seinfeld* series, was entertainment); *Disney Enters. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 972-73 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017) (service which edited out objectionable content from films and TV shows not transformative because the edited films and shows served the same entertainment purpose as the originals).

36

*Boldly* falls into the latter category. Defendants intentionally used Dr. Seuss's works for the same purpose that Dr. Seuss originally created them: to entertain the reader (often a graduate starting a new stage in life) with an uplifting story. *Boldly* covers the same ground as *Go!*. In *Go!*, Dr. Seuss drew imaginative, amusing, and otherworldly environments and characters and told a story in which the reader, depicted as a "boy," confronts unusual, unexpected challenges in life, and ultimately overcomes them to become a "success." *Boldly* appropriated Dr. Seuss's drawn environments, which even in the original works could be viewed as located in outer space and other planets, dressed Dr. Seuss's "boy" in a gold Star Trek uniform, and told a story of him confronting and overcoming the unusual and unexpected challenges presented in *Star Trek*, ultimately overcoming them and rising to attain success in the *Star Trek* universe by becoming a Starfleet captain.

The court found that *Boldly* had a different purpose because its message was "tailored to fans of *Star Trek*'s Original Series." ER19. This is not a different purpose, merely a different breadth of audience appeal. The purpose of existing and new entertainment works may be the same even if the audience for the new work is more limited than the potential consumers of the original. *See, e.g.*, *TCA Television Corp.*, 839 F.3d at 175 (use of famous G-rated "Who's on First" routine in Broadway adult "dark comedy").

37

Moreover, the potential audience for *Boldly* is simply a subset of the potential audience for *Go!* and *Go!* derivatives. *Go!* is a *New York Times* best seller during graduation season, and Defendants and their publishers specifically targeted this graduation gift market. ER5; ER30-31. One can reasonably conclude that a meaningful percentage of graduating high school and college seniors, for whom *Go!* would be ordinarily purchased by friends or relatives, are *Star Trek* fans and would be entertained by a "*Star Trek*-centric" version of *Go!*. Even the district court thought this was likely. ER19. *Boldly* simply supplants Dr. Seuss's purposes by offering a version of *Go!* that may have greater appeal to that subset of the larger audience.[1]

### d. Defendants Used Dr. Seuss's Works for a Commercial Purpose

In evaluating the first factor, courts must also consider whether a defendant's use of a plaintiff's work "is of a commercial nature" 17 U.S.C. § 107(1). Although commercial uses are not presumptively unfair, commerciality "looms larger" if the defendant's work has "no critical bearing on the substance or style of the original." *Campbell*, 510 U.S. at 580, 584; *see also Leadsinger, Inc. v.*

---

[1] While a handful of decisions have held that an artist adding a new or different aesthetic to an existing work also may make the second work transformative, *see, e.g.*, *Cariou v. Prince*, 714 F.3d 694, 700, 708, 711 (2d Cir. 2013); *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006); *see also Seltzer*, 725 F.3d at 1177-78, defendants did the opposite: they "slavishly copied" Dr. Seuss's drawings so that *Boldly* would come as close as possible to *Go!*'s original aesthetic. ER409-11.

*BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) (commerciality cuts against the defendant when its work is not transformative). This is in part because a commercial work is more likely to displace markets for the plaintiff's original work. *Monge*, 688 F.3d at 1176.

*Boldly* was unquestionably a commercial venture. Defendants sought to earn profits from selling books to the same graduation market customers that buy *Go!* as a gift. Indeed, they viewed *Boldly*'s title as like "printing money," and contemplated a "nice payday" from DSE if it chose to publish the book instead. The commerciality of *Boldly* therefore further tilts the first factor toward DSE.

### e. Defendants Unfairly Used Dr. Seuss's Works For Their Attention-Getting Value

The undisputed record shows that from the start, Defendants set out to steal the illustrations and styles of a well-known book for their *Star Trek* mash-up. ER175; ER181; ER186; ER189; ER130; ER136; ER196-203; ER761-69; ER430-31; ER146-47. After settling on *Go!* as their target, they directed the illustrator to make his drawings "nearly identical" to Dr. Seuss, rejecting early versions because they were not close enough to *Go!*. ER259-60; ER270-71; ER273; ER409-11. Defendants also deliberately wrote *Boldly* to parallel *Go!* and make the same uplifting point of overcoming obstacles that Dr. Seuss instilled into *Go!*, in order to attract Dr. Seuss fans as buyers. ER420-24.

As this Court held on similar facts in *Penguin Books*, the intentional use of Dr. Seuss's drawings as a hook to attract the attention of purchasers is the antithesis of fair use. 109 F.3d at 1401. Circuit Judge Leval—on whose academic writings the Supreme Court relied extensively in *Campbell*—recently made this point in a lecture on fair use, saying that there is:

> a common form of copying that is neither parodic nor satirical, where one simply piggybacks on a famous song, poem or passage, or logo, playing on public recognition of the original to give punch, or humor to a new, unrelated message. Where the copying is essentially either to harness the expressive brilliance of the original for the delivery of the copier's message, or to gain audience impact for the new message by free-riding on the fame of the original expression, courts should ponder whether such changes can qualify as transformative, whether they have arguable justification for copying. It is difficult to see why the original author should not be entitled to a fee for licensing such a utilization of her work.

Pierre Leval, Fair Use: A Ramble through the Bramble, NYU Proving IP Symposium, May 16, 2019, video available at https://www.youtube.com/watch?v=OGky_yG8dV8 (last accessed August 4, 2019). *See also* Pierre Leval, *Campbell* As Fair Use Blueprint, 90 Wash. L. Rev. 597, 611-12 (2015). This description fits *Boldly* like a glove.

Accordingly, the first factor cuts decisively in DSE's favor.

5. **The Nature of Dr. Seuss's Works Weighs Against Fair Use (Second Factor)**

The second fair use factor considers the "nature of the copyrighted work" used by the defendant. 17 U.S.C. § 107(2). Creative images, which have been created for public viewing, are closer to the heart of copyright and deserving of greater protection. *VHT, Inc. v. Zillow Grp.*, 981 F.3d 723, 743-44 (9th Cir. 2019); *Perfect 10*, 508 F.3d at 1167.

The second factor overwhelmingly favors DSE. Few works are more creative than the Dr. Seuss illustrations copied by Defendants. For his entire career, he was a untiring source of inventiveness: his unique drawings have charmed and entertained generations. The Court's statement in *Penguin Books*, directed to another famous Dr. Seuss book, applies equally here: "[t]he creativity, imagination and originality embodied in [*Go!*] and its central character tilts the scale against fair use." 109 F.3d at 1402.

6. **The Amount and Value of Material Taken by Defendants from Dr. Seuss Was Excessive and Weighs Against Fair Use (Third Factor)**

The third fair use factor looks to "the quantitative amount and qualitative value" of the portion of the original work used in relation to the justification advanced for its use. *Seltzer*, 725 F.3d at 1178; *see also Campbell*, 510 U.S. at 586. The first factor, the "purpose and character of the use," affects evaluation of the third factor, particularly where the "quantitative amount" taken is all or most of

the original work. *Id.* at 577; *Seltzer*, 725 F.3d at 1178. The fourth factor, impact on markets, is also considered because one aspect of the third factor is whether the use is extensive enough to make the defendant's work a market substitute for the original or "potentially licensed derivatives." *Campbell*, 501 U.S. at 587.

When it is not essential to take the entirety of a work for the alleged fair use, it is more difficult to justify extensive copying. *VHT*, 918 F.3d at 744 ("[N]othing justifies Zillow's full copy display of VHT's photos on Digs."); *Penguin Books*, 109 F.3d at 1403 (rejecting defendant's justification for appropriating the Cat in the Hat image on the front and back covers of its book and 13 times in the text as "pure schtick"); *compare Seltzer*, 725 F.3d at 1178 (plaintiff's photograph, "unlike an episode of the Ed Sullivan show or a book manuscript . . . is not meaningfully divisible," and the entire photograph had to be used to achieve the defendant's new meaning or message).

Courts also consider the quality of what has been taken. Fair use is less likely where what has been taken lies near the creative heart of the original. *Elvis Presley Enters.*, 349 F.3d at 630 (third factor favored plaintiff where the defendant's film made repeated unlicensed use of multiple Elvis Presley performance clips where the star was singing "the most familiar passages of his most popular songs").

Defendants' takings from *Go!* and other Dr. Seuss works were extensive both in quantity and quality. *Boldly* substantially copied 14 of *Go!*'s 24 pages. Defendants also copied central drawings from *Grinch* and *Sneetches*:





| Dr. Seuss Work | Infringing Work |
| --- | --- |

ER943-1041; ER1057; ER1104-29; ER935-37.

These extensive takings are also qualitatively important because they give *Boldly* the "feel" of a true Dr. Seuss book. *See Paramount Pictures v. Axanar Prods.*, 2:15-CV-09938-RGK-E, 2017 WL 83506, at *8 (C.D. Cal. Jan. 3, 2017) (fan-made *Star Trek* films failed third factor where elements of the *Star Trek* world "pervade[d]" the fan films and gave the films the desired "feel" of *Star Trek*).

The district court found that Defendants "took no more than necessary for [their] purposes, *i.e.*, a 'mash-up' of *Go!* and *Star Trek*, and that, consequently, this factor does not weigh against defendants." ER24; ER82. This conclusion was based on the court's prior erroneous finding that mash-ups are inherently transformative. Indeed, the court's view of mash-ups was so uncritical that it never identified *any* limitation on how much a mash-up could take from another work, which would mean that the third factor would automatically favors a mash-up writer even if two *entire* works are taken. Uncorrected, this erroneous view would

allow the "safety valve" exception of fair use to swallow the rule of copyright protection.

The court's heavy reliance (ER22) on *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998) (*Leibovitz II*) as the most "analogous" case was misplaced. *Leibovitz* was a parody case, where the plaintiff conceded that the parody did not harm markets for her original work or for its derivatives. *Id.* at 116. The plaintiff photographed the actress Demi Moore, nude and pregnant, that attracted much public comment when published as a magazine cover. *Id.* at 111. To advertise their comic film, the defendants photographed male comedian Leslie Nielsen naked, in Moore's original pose, and digitally enhanced the image to make him appear pregnant. *Id.* at 111. They also replicated the lighting and skin tones of the original. *Id.* at 111-12. The photo was held to have parodic character, because it ridiculed the original photograph, and to be relevant to the film, where Nielsen's character is afraid of his wife becoming pregnant. *Leibovitz v. Paramount Pictures Corp.*, 948 F. Supp. 1214, 1222 (S.D.N.Y. 1996) (*Leibovitz I*). The Second Circuit concurred with this assessment. *Leibovitz II*, 137 F.3d at 117.

The facts here are not remotely analogous. *Boldly* does not parody or comment on *Go!*, the *Star Trek*-oriented story told in *Boldly* is not relevant to *Go!,* and Defendants' use of Seussian material in *Boldly* was solely for the purpose of

45

attracting buyer attention to the book. ER81; ER265; ER295-96; ER300; ER319; ER413.

"Moreover, to parody the Demi Moore photograph effectively, it was reasonably necessary to use "nearly the entirety of the plaintiff's photograph." ER24. However, this Court has recognized that photographs are indivisible and generally must be taken in nearly their entirety for fair use. *See Perfect 10*, 508 F.3d at 1146; *Kelly v. Arriba Soft Corp*., 336 F.3d 811, 820-21 (9th Cir. 2003) (to be effective, Internet search engines had to replicate plaintiffs' entire photographs); *Seltzer*, 725 F.3d at 1178 ("The individual photograph parodied in *Leibowitz*, unlike a "a book manuscript . . . is not meaningfully divisible."). In contrast, *Go!* is a 24-page book with a separate illustration on each page or across two pages. Defendants copied from *fourteen* of those drawings, plus famous individual drawings from *Grinch* and *Sneetches*. ER943-1041; ER1057; ER1104-29; ER935-37. There is no indivisibility issue: each Dr. Seuss drawing that Defendants copied would be a separately copyrightable work if it had not been published in book form. The court's assertion that Defendants here took "less" of the underlying works than did the parody in *Leibowitz* (ER24) ignores this essential difference.

The district court also took an unduly narrow view of what elements are protected in Dr. Seuss's works, and what Defendants actually took. *Leibowitz* was a photograph of a real person, hand on pregnant belly, in a classic Madonna pose.

Neither Demi Moore's actual appearance nor her pose was protected by copyright, and copyright protected only the choices of lighting and tone made by the photographer. *Leibowitz*, 137 F.3d at 116. The district court here applied the same dissection and concluded that DSE was attempting to assert copyright over unprotectable geometric shapes. ER23-24.

This reasoning was flawed in essential respects. First, the court's analysis was myopic: it looked only at the cover of *Boldly*, which contains fairly few of the artistic elements of *Go!*'s cover, but ignored the many pages of *Boldly* that copied far more extensively from the creative elements of *Go!* and other Seuss works.[2] ER21-22. Second, the dissection approach of *Leibowitz* does not apply here. Nothing in Dr. Seuss's drawings is real or classic, or otherwise in the public domain. His drawings depict imaginary worlds, creatures, and machines, and look like no other artist's work. While the general concept of artistically rendered imaginary worlds and beings is not protected, that does not help Defendants: they extensively copied from Dr. Seuss's *particular* rendering of those concepts, which is unquestionably copyright-protected material.

---

[2] However, the cover of *Boldly* did use the source-identifying trademarks that appear on the cover of *Go!*: the book's title, Dr. Seuss's illustration style, and the font that DSE uses on all Dr. Seuss derivative book covers.

Finally, although *Boldly* does not always copy the Dr. Seuss drawings verbatim and adds some *Star Trek* elements (ER21-24), this does not affect third-factor evaluation, because "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Harper & Row,* 471 U.S. at 565 (citation and internal quotation marks omitted).

Defendants' quantitative and qualitative taking from Dr. Seuss was extensive. Because their mash-up was not meaningfully transformative, the amount of original expression taken was not "reasonably necessary," and accordingly was excessive as a matter of law. Even if the Court were to find transformative elements in *Boldly*, Defendants took far more of Dr. Seuss's creative works than was justified by such transformation. In either case, the third factor of fair use strongly favors DSE.

### 7. The Harm to DSE's Potential Markets Weighs Against Fair Use (Fourth Factor)

The fourth fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The case law has established several important considerations in fourth-factor analysis, each of which was ignored or misapplied by the district court. These crucial errors of law in the district court's ruling require its reversal.

First, where the defendant's threatened use of the plaintiff's work is not transformative and is commercial, courts should presume that the use would likely

48

harm the copyright owner's potential markets. *VidAngel*, 869 F.3d at 861. As shown in the first-factor discussion, *Boldly* was not transformative and was a commercial book. As such, harm should be presumed. *See id.* The district court's rejection of this presumption (ER29) was error. If this Court agrees, the fourth factor favors DSE based on the presumption alone because Defendants failed to show that DSE would *not* suffer market harm if *Boldly* were published as originally planned. But even if harm is not presumed, the summary judgment record overwhelmingly favors DSE on this factor.

Second, having found transformation and therefore no presumption of market harm, the district court made an unsupported leap of logic: that the burden of proof on the fourth factor shifted to DSE. It said that DSE must show "[s]ubstantial harm to it" arising solely from sales of *Boldly* (ER25 (citing *Campbell*, 510 U.S. at 593)), and "make this showing 'by a preponderance of the evidence,'" ER25 (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)). The court then ruled that DSE had not cleared this high bar, asserting that any injury was only "hypothetical," and that DSE "failed to sustain its burden to demonstrate by a preponderance of the evidence that *Boldly* is likely substantially to harm the market for *Go!* or licensed derivatives of *Go!*." ER26. It concluded that the fourth factor therefore "favor[ed] neither party." ER35.

This is wrong.  The fair use claimant retains the burden of proving *absence* of market harm even where no presumption of harm is applied.  In *Campbell*, the Supreme Court found no presumption of harm from the subject parody, yet still stated that "fair use is an affirmative defense" and "the proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets."  510 U.S at 590.  This "favorable evidence" can only be the defendant offering convincing proof that the plaintiff's markets will *not* be harmed by the challenged work.  *See Monge*, 688 F.3d at 1181 (this Court declined to apply presumption of harm but still noted defendant's "failure of proof" in showing "lack of market harm").[3]  Defendants failed to show that market harm to *Go!* and its derivatives would *not* occur, and thus failed to carry their burden.[4]

---

[3] The district court cited an equivocal statement by DSE's counsel during argument as conceding that "if the Court concludes that *Boldly* is transformative, the burden is on Plaintiff to demonstrate a likelihood of future market harm."  ER25.  The portion of the transcript cited by the court shows no plain concession on this issue, and overall reflects DSE's position that *Boldly* was not transformative, but that if it were and no presumption applied, the undisputed evidence still showed a strong likelihood of future market harm to DSE.  ER104-10.  Even had any such concession been made, however, it would not control this Court's resolution of a purely legal issue: who bears the burden of proof on the fourth factor.  "This court is not bound by the concessions of parties concerning the meaning of the law." *Price v. Sery*, 513 F.3d 962, 971 (9th Cir. 2008); *see also United States v. Ogles*, 440 F.3d 1095, 1099 (9th Cir. 2006) (*en banc*).

[4] Defendants submitted an expert report on the fourth factor, which DSE moved to strike on the grounds that the report was unreliable and therefore inadmissible.  ER731.  The district court did not rule on the motion, stating that it reached its judgment on fair use without consideration of expert evidence.  ER39.

Third, the district court incorrectly examined only whether sales of *Boldly* itself would harm DSE's original and derivative rights. ER25. However, Congress recognized that while a single infringer's activities may not have a material impact on the sales of the original work or derivatives, failure to deter him will attract more infringers who will also copy from the original (and other works), and erode both the individual copyright owner's markets and the overall incentive to create new works. S. Rep. No. 94-473, p. 65 (1975) ("Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented.").

The correct question in fourth-factor analysis is thus "whether *unrestricted and widespread conduct of the sort engaged in by the defendant* . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (quoting Nimmer on Copyright § 13.05[A][4], p. 13-102.61) (internal quotation marks omitted; emphasis added). *See also VHT, Inc.*, 918 F.3d at 744; *Elvis Presley Enters.*, 349 F.3d at 631 ("If this type of use became widespread, it would likely undermine the market for selling Plaintiff's copyrighted material."). Despite mentioning this requirement in passing (ER24), the court failed to apply it, focusing solely on the market impact of *Boldly* itself.

Allowing widespread copying of *Go!*'s illustrations to create mash-ups with other owners' works would unquestionably harm sales of *Go!*. *Go!*'s recipients are

young adults who live and breathe pop culture. If the decision below is not reversed, others will be emboldened to produce specialized versions of *Go!* using *Star Wars* characters, Marvel Comics characters, etc. These will be aimed, as was *Boldly*, at *Go!*'s graduation market. A meaningful proportion of gift buyers, knowing that a graduating senior was a *Star Wars* or comic book fan, would purchase one of these unauthorized derivatives rather than *Go!* itself. This proliferation of unauthorized *Go!* versions with pop culture hooks would erode sales of *Go!* itself.

Fourth, while briefly nodding to the undisputed evidence in the record showing likelihood of market harm, the court proceeded to ignore that evidence or downplay it, failing to draw all inferences in favor of DSE, the non-movant.[5]

The court found no likely harm to *Go!*'s primary market as a graduation gift, even though it found that *Boldly* would have been marketed to the same graduation market, and that "some would-be purchasers of *Go!* would instead purchase *Boldly* for a Trekkie graduate." ER30-31. Its conclusion was based on only two data points: *Go!* is DSE's best-selling book, while Defendants raised small sums on Kickstarter and planned only a 5,000 copy initial run for *Boldly*; and DSE did not

---

[5] The court began its analysis by digressing into *Boldly*'s alleged lack of impact on "*Go!*'s market as a children's book," ER29; ER84. But the court found as undisputed fact that "*Go!* [is] also aimed at teenagers and adults," "marketed to both age groups," and "is a very popular gift for graduates." ER5.

present expert evidence to quantify the likely effect that a published *Boldly* on

sales of *Go!* in the graduation market. ER30.

This conclusion was unprecedented and wrong. No prior decision has ever

held that there is insignificant market impact because the original work is popular

and the infringer is starting with a small initial release of the infringing work. No

prior decision has ever required the copyright owner to quantify the losses that will

likely flow when a defendant's infringing work is released.[6] The law goes the

other way. *See, e.g.*, *Axanar Prods.*, 2017 WL 83506, at *9 (C.D. Cal. Jan. 3,

---

[6] The two cases relied on below (ER27-29) do not support the district court's conclusions. In *Equals Three, LLC v. Jukin Media Inc.*, 139 F. Supp. 3d 1094 (C.D. Cal. 2015), the second user created programs for a YouTube channel. The programs incorporated the copyright owner's video clips while a host gave a monologue commenting on the events shown in the clips. *Equals Three* held that the programs that "made [defendant's] videos . . . the butt of . . . jokes" were transformative, *id.* at 1105, but that one program that "was not directly aimed at criticizing or commenting on the *video*" was not transformative. *Id.* at 1106 (emphasis in original). *Equals Three*'s fourth-factor analysis was shaped by these conclusions on transformativeness. It found that the first set of programs would not harm a potential market because there was no "cognizable derivative market for criticism." *Id.* at 1007. However, for the non-transformative program, it found that the program "is likely to cause market harm by usurping demand for a cognizable derivative market." *Id.* at 1108 n.12. In *Perfect 10, Inc.*, 508 F.3d at 1146, Google's use of the plaintiff's photos for search engine purposes was found highly transformative, there was no evidence that plaintiff had a potential market for cellphone downloads of thumbnail-sized images similar to those shown in Google Image Search results, and any such possible use was outweighed by the transformative nature of Google's use. *Id.* at 1167. Here, in contrast, *Boldly* is not transformative, and DSE showed that there were derivative markets for authorized mash-ups between Dr. Seuss and other copyright owners that were "traditional, reasonable, or likely to be developed," *Seltzer*, 725 F.3d at 1179.

53

2017) (unreleased *Star Trek* fan films funded through Kickstarter held not fair uses as they were the kind of derivative works plaintiff would make and there was risk of some market substitution; no expert projection of possible losses required). Shoehorning such improper considerations into fair use analysis would seriously weaken copyright protection for original works.

Fifth, the court's consideration of DSE's derivative markets was equally flawed. The court recognized that DSE was the top book licensor, that most of its revenues come from licensing original Dr. Seuss works for the derivative markets, that it has licensed derivatives of *Go!*, and that DSE has engaged in collaborations that combine DSE and another owner's intellectual property, *i.e.*, mash-ups. ER32. The court found nevertheless that DSE had not shown lost licensing opportunities as a result of publication of *Boldly* or other works. It cast doubt on whether *Boldly* occupies a market that DSE is likely to develop, because DSE had provided a style guide to certain licensees which instructed them not to mix Dr. Seuss characters with third party characters. ER32 at n.8. However, DSE had presented uncontradicted evidence that it did, in fact, enter into collaborations with other copyright owners where the style guide did not apply and the intermingling of Dr. Seuss elements in the work was determined by the agreement between the parties. ER905. Moreover, the court had actually acknowledged in the paragraph

immediately preceding its finding that DSE had *already* entered into collaborations that did mix characters from Dr. Seuss and other creators.  ER32.

The court ignored other evidence that *Boldly* intruded into DSE's existing derivative markets.  In fact, combining the DSE Works with Star Trek intellectual property to create a new illustrated work *is* the type of derivative work that DSE would license.  ER889; ER897-98; ER908; ER931-32; ER1285-86; ER1302-03; ER1771-1840.  Defendant Hauman even expected that DSE itself would like to publish *Boldly*, giving Defendants a "nice payday."  ER343-45; ER1048-54; ER478-84.

DSE's claim of harm to its derivative markets was not a product of "circular reasoning,"  ER32.  Rather, *Boldly* was a type of derivative work "for which there [is] a separate demand that [DSE] may one day seek to exploit."  *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 519 (7th Cir. 2002).  DSE showed that it was capable of and inclined to meet that market demand.  To favor the copyright holder, the fourth factor requires nothing more.

Sixth, it does not matter whether DSE would ever license *Boldly*, another amalgam of Dr. Seuss and *Star Trek*, or indeed any derivative works based on *Go!*. The derivative works right of the copyright owner, 17 U.S.C. § 106(2), includes the right *not to make* derivatives of an original, the right to decide *when* to make derivatives and *who* will make them, and the right to *change its mind* about which derivatives it will authorize.  *Monge*, 688 F.3d at 1181; *Castle Rock Entm't, Inc.*, 150 F.3d at 145–46 ("It would . . . not serve the ends of the Copyright Act—*i.e.*, to advance the arts—if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original."); *Penguin Random House LLC v. Colting*, 270 F. Supp. 3d 736, 752-54  (S.D.N.Y. 2017).  Defendants' unilateral decision to produce an unauthorized derivative of *Go!* usurped this right.  This is additional cognizable market harm under the fourth factor.

In sum, when the uncontradicted evidence is considered under the correct legal standards, the fourth factor tips decisively toward DSE.

### 8.  The Factors Weighed Together Show That *Boldly* Is Not a Fair Use

The final step in fair use analysis is to weigh the four factors together.  Here, the task is easy, because all four favor DSE: *Boldly* is not transformative; *Go!* and the other copied DSE Works are highly creative; the amount copied by Defendants is extensive and excessive; and there would be real adverse market impacts on

56

*Go!*'s markets were Defendants and others allowed to copy from Dr. Seuss in this manner. "Without a single factor tipping in [their] favor, [Defendants] ha[ve] not met [their] burden" on fair use. *Monge*, 688 F.3d at 1184.

Defendants' affirmative defense of fair use therefore fails as a matter of law. And there is no reasonable dispute that DSE established the affirmative elements of its copyright claim—ownership and copying—on summary judgment. The Court should therefore reverse the district court's judgment and remand for entry of judgment in DSE's favor on the copyright infringement claim and a determination of damages and attorney's fees.

## C. The District Court Also Erred in Dismissing DSE's Trademark Claims as a Matter of Law

The district court's dismissal of DSE's trademark claims should be reversed and remanded for two reasons. First, there is a triable issue of fact on whether the First Amendment shields Defendants' use of DSE's trademarked book title. Second, there is a triable issue of fact on whether Dr. Seuss's distinctive illustration style and font is a protectable trademark.

### 1. The First Amendment Does Not Automatically Protect Defendants' Infringing Book Title.

This Court's recent decision in *Gordon v. Drape Creative, Inc.*, 909 F.3d 257 (9th Cir. 2018), requires reversal of the district court's ruling that the First Amendment immunizes Defendants' trademark infringement as a matter of law.

Where trademark claims address the title or other content of an expressive work, this Court uses the two-pronged test of *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), to balance the public's interest in preventing consumer confusion with the author's First Amendment interests.  *See Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900-01 (9th Cir. 2002); *Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017) ("*Empire*").

Under *Rogers*, "the title of an expressive work does not violate the Lanham Act '[1] unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, [2] unless the title explicitly misleads as to the source or the content of the work.'"  *Empire*, 875 F.3d at 1196 (quoting *Mattel*, 296 F.3d at 902).  A triable issue of fact on *Rogers*' second, "explicitly misleads" prong precludes summary judgment for a defendant.

In *Gordon*, the creator of the "Honey Badger" YouTube video alleged that the defendants had infringed his trademarks by selling unlicensed greeting cards that used "Honey Badger Don't Care" and related phrases that the plaintiff had licensed to other greeting card makers.  909 F.3d at 261-63.  The Court reversed summary judgment for the defendants, emphasizing that *Rogers* "is not a mechanical test—'all of the relevant facts and circumstances' must be considered." *Gordon*, 909 F.3d at 269 (quoting *Rogers*, 875 F.2d at 1000 n.6).  The Court "therefore reject[ed] the district court's rigid requirement that, to be explicitly

58

misleading, the defendant must make an 'affirmative statement of the plaintiff's sponsorship or endorsement.'" *Id.*

This Court held instead: "In some instances, the use of a mark alone may explicitly mislead consumers about a product's source if consumers would ordinarily identify the source by the mark itself." *Id.* at 270. For example, "[i]f an artist pastes Disney's trademark at the bottom corner of a painting that depicts Mickey Mouse, the use of Disney's mark, while arguably relevant to the subject of the painting, could explicitly mislead consumers that Disney created or authorized the painting, even if those words do not appear alongside the mark itself." *Id.*

The Court clarified that the reasoning in earlier Ninth Circuit decisions applying *Rogers* did not apply because, in those decisions, "it was clear that consumers would not view the mark alone as identifying the source of the artistic work." *Id.* However, "this reasoning does not extend to instances in which consumers *would* expect the use of a mark alone to identify the source." *Id.* In such instances, "[a] more relevant consideration is the degree to which the junior user uses the mark in the same way as the senior user." *Id.* The Court observed that *Rogers* itself held that "'misleading titles that are confusingly similar *to other titles*' can be explicitly misleading, regardless of artistic relevance." *Id.* (quoting *Rogers*, 875 F.2d at 999 n.5). Thus, even though the back of the greeting cards in *Gordon* showed defendants' trademark, a jury could still conclude the use of the

"Honey Badger Don't Care" mark on the front of the cards was explicitly misleading. The Court therefore reversed the summary judgment. *Id.* at 271.

Under *Gordon*, the Court should reverse the district court's pleading-stage dismissal of DSE's trademark claim based on *Go!*'s title. The district court ruled that DSE could not prevail because Defendants made no separate affirmative statement that DSE endorsed or helped create *Boldly*. ER47-48. It said that "if Defendants had included a leaflet or a statement within *Boldly* that stated Plaintiff endorsed or was involved in the production of *Boldly*, this may be sufficient." ER47.

This ruling is precisely what *Gordon* rejects: a "rigid requirement that, to be explicitly misleading, the defendant must make an 'affirmative statement of the plaintiff's sponsorship or endorsement.'" 909 F. 3d at 269. This legal error itself requires reversal and a trial. The similarities of the titles, and the fact that DSE had authorized many books with titles patterned after *Oh The Places You'll Go!*, are uncontested. Defendants' use of the Dr. Seuss illustration style and font reinforced the explicitly misleading nature of *Boldly*'s title. The court below acknowledged it "ha[d] found that '[t]he look of the lettering is unquestionably identical on both books, down to the shape of the exclamation point.'" ER48 (quoting ER70). Defendants even admitted they sought to copy the title and other cover elements of *Go!* to ensure that *Boldly* would "match the look and feel of Seuss books."

ER438-42; ER1140-49. "[T]he potential for explicitly misleading usage is especially strong [here,] when the senior user and the junior user both use the mark in similar artistic expressions." *Gordon*, 909 F.3d at 270.

These facts warrant a trial. As in *Gordon*, "[t]here is at least a triable issue of fact as to whether defendants simply used [DSE's] mark with minimal artistic expression of their own, and used it in the same way that [DSE] was using it – to identify the source of" a book with a virtually identical title to *Go!*. *Id.* at 271.

### 2. Dr. Seuss's Distinctive Illustration Style and Font Are Eligible for Trademark Protection.

The district court also erred in ruling that Dr. Seuss's distinctive illustration style and the Seussian font are legally ineligible for trademark protection. ER36-39. The Lanham Act expansively defines a trademark as "any word, name, symbol, or device, or any combination thereof" used "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. The Supreme Court has observed that the Act "describes that universe in the broadest of terms. . . . Since human beings might use as a 'symbol' or 'device' almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162 (1995). The mark owner need only show that the claimed mark is inherently distinctive or has attained secondary meaning. *Id*. at 163-64.

The district court's categorical exclusion of illustration styles from trademark protection violates the Supreme Court's mandate that "almost anything at all that is capable of carrying meaning" can be a mark. *Id*. at 162. Its ruling is also contradicted by persuasive cases DSE cited below. *See, e.g.*, *Romm Art Creations Ltd. v. Simcha Int'l, Inc.*, 786 F. Supp. 1126 (E.D.N.Y. 1992) (granting injunction, observing that Lanham Act protection "extends to 'words, symbols, collections of colors and designs, or advertising materials or techniques' that the purchasing public has come to associate with a single source," and finding no reason to categorically reject plaintiff's "artistic style" claims); *Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946 (2d Cir. 1981) (cover style of romance novel series); *Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp. 2d 1110, 1122 (W.D. Wash. 2007) (name, title and cover design of book).

DSE is likewise entitled to show that the distinctive Dr. Seuss illustration style and font is a trademark because it is recognized by consumers as an indication of origin, using "direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant," *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999).

Because the court applied the wrong law, it ignored DSE's substantial evidence of secondary meaning. The Seussian style is itself an indication of origin; indeed, the Merriam-Webster dictionary defines "Seussian" as the distinct style emanating from Dr. Seuss. ER204-05. Other evidence included Defendants' intentional copying of the style and font marks. ER436-37; ER409-11; ER139; ER149; ER155; ER158; ER186-87; ER739-69; ER199-203; ER433-34; *see adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 755 (9th Cir. 2018). The evidence of secondary meaning also included DSE's unrebutted expert survey showing actual confusion from this use. ER789; ER815-16. "[T]he law clearly establishes that actual confusion is an indicium of secondary meaning." *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 987 (9th Cir. 1995) (citation and internal quotation marks omitted). The expert survey showed that when a group of consumers was shown *Boldly*, and a separate control group was shown a version of *Boldly* without the Seussian style, a far lower percentage of the control group believed that *Boldly* is associated with Seuss. ER789; ER815-16 (showing that 24% of consumers are confused as to origin because Defendants used DSE's distinctive illustration style and font of *Boldly*).

Accordingly, the Court should reverse the district court's dismissal of the trademark claims in its Rule 12(c) and summary judgment rulings, and remand those claims for a trial.

## VII.  CONCLUSION

The copyright fair use defense in this case fails as a matter of law.  The district court's contrary decision should be reversed.  Because the undisputed facts establish copyright infringement, summary judgment should be ordered in DSE's favor on its copyright claims, and the copyright claim remanded for a determination of damages and attorney's fees.

The district court also erred as a matter of law is dismissing DSE's trademark infringement claims.  This part of the district court's judgment should be vacated and remanded for trial.

Dated:  August 5, 2019   Respectfully submitted,

*/s/ Stanley J. Panikowski*
STANLEY J. PANIKOWSKI
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: (619) 699-2643
Facsimile: (619) 699-2701

ANDREW L. DEUTSCH
DLA PIPER LLP (US)
2000 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-4704
Telephone: (310) 595-3000
Facsimile: (310) 595-3300

TAMAR Y. DUVDEVANI
MARC E. MILLER
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone: (212) 335-4799
Facsimile: (212) 335-4501

*Attorneys for Plaintiff-Appellant*
Dr. Seuss Enterprises, L.P.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 19-55348

I am the attorney or self-represented party.

**This brief contains** | 13,925 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⊙ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated |          | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Stanley J. Panikowski | **Date** | Aug 5, 2019

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8**                                          *Rev. 12/01/2018*

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiff-Appellant Dr. Seuss

Enterprises, L.P. is unaware of any related cases pending in this Court.

Dated: August 5, 2019

*/s/ Stanley J. Panikowski*
STANLEY J. PANIKOWSKI
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone: (619) 699-2643
Facsimile: (619) 699-2701

*Attorneys for Plaintiff-Appellant*
Dr. Seuss Enterprises, L.P.

## **CERTIFICATE OF SERVICE**

I certify that I electronically filed this OPENING BRIEF OF PLAINTIFF-APPELLANT DR. SEUSS ENTERPRISES, L.P. (REDACTED) with the United States Court of Appeals for the Ninth Circuit via the Court's CM/ECF system on August 5, 2019, and that service will be made on counsel of record for all parties to this case through the Court's CM/ECF system.

*/s/ Stanley J. Panikowski*
STANLEY J. PANIKOWSKI
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: (619) 699-2643
Facsimile: (619) 699-2701

# ADDENDUM: PERTINENT STATUTES

## __TABLE OF CONTENTS__

**Statute**                                                             **Page**

17 U.S.C. § 107                                                 1

17 U.S.C. § 106(2)                                            2

15 U.S.C. § 1127 (in part)                                 2

**17 U.S.C. § 107**

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

**17 U.S.C § 106(2)**

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

. . .

(2) to prepare derivative works based upon the copyrighted work;

. . .

**15 U.S.C. § 1127 (in part)**

. . .

The term "trademark" includes any word, name, symbol, or device, or any combination thereof—

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

. . .