**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DR. SEUSS ENTERPRISES, L.P., a California limited partnership, *Plaintiff-Appellant*, v. COMICMIX LLC, a Connecticut limited liability company; GLENN HAUMAN, an individual; DAVID JERROLD FRIEDMAN, AKA David Gerrold, an individual; TY TEMPLETON, an individual, *Defendants-Appellees*. | No. 19-55348 D.C. No. 3:16-cv-02779-JLS-BGS OPINION |

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted April 27, 2020
Seattle, Washington

Filed December 18, 2020

Before: M. Margaret McKeown, N. Randy Smith, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Copyright / Trademark

The panel reversed the district court's summary judgment in favor of defendants on a copyright infringement claim and affirmed the district court's dismissal and grant of summary judgment in favor of defendants on a trademark claim concerning the book *Oh, the Places You'll Boldly Go!*, a Dr. Seuss and *Star Trek* mash-up.

Reversing the district court's summary judgment on the copyright claim, and remanding, the panel held that defendants' use of Dr. Seuss's copyrighted works, including the book *Oh, the Places You'll Go!* ("*Go!*"), was not fair use. The panel concluded that all of the statutory factors weighed against fair use, and no countervailing copyright principles counseled otherwise. The purpose and character of *Oh, the Places You'll Boldly Go!* ("*Boldly*") weighed against fair use because defendants' use was commercial and was not a parody or otherwise transformative. The creative nature of *Go!* and the amount and substantiality of the use of *Go!* also weighed against fair use, as did the potential market for or value of Seuss. The panel held that because fair use is an affirmative defense, the burden is on defendants with respect to market harm.

Affirming in part, the panel held that plaintiffs did not have a cognizable trademark infringement claim because, under the *Rogers* test, the Lanham Act did not apply. The panel concluded that the allegedly valid trademarks in the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

title, the typeface, and the style of *Go!* were relevant to achieving *Boldly*'s artistic purpose, and the use of the claimed *Go!* trademarks was not explicitly misleading.

## COUNSEL

Stanley J. Panikowski (argued), DLA Piper LLP (US), San Diego, California; Andrew L. Deutsch DLA Piper LLP (US), Los Angeles, California; Tamar Y. Duvdevani and Marc E. Miller, DLA Piper LLP (US), New York, New York; for Plaintiff-Appellant.

Dan Booth (argued), Dan Booth Law LLC, Concord, Massachusetts; Michael Licari, Sprinkle Lloyd & Licari, LLP, San Diego, California; for Defendants-Appellees.

Jacqueline C. Charlesworth, Alter, Kendrick & Baron LLP, New York, New York, for Amicus Curiae the Motion Picture Association Of America, Inc.

Susan Kohlmann and  Alison Stein, Jenner & Block LLP, New York, New York; James Dawson, Jenner & Block LLP, Washington D.C.; Keith Kupferschmid and Terry Hart, Copyright Alliance, Washington D.C.; for Amicus Curiae the Copyright Alliance.

Peter S. Menell, Berkeley Center For Law & Technology, University of California, Berkeley School of Law, Berkeley, California for Amici Curiae Professors Peter S. Menell, Shyamkrishna Balganesh, and David Nimmer.

Dean S. Marks, Dean S. Marks, Attorney-at-Law, Sherman Oaks, California for *Amicus Curiae* Sesame Workshop.

Mason A. Kortz, Cyberlaw Clinic, Harvard Law School, Cambridge, Massachusetts, for Amici Curiae Electronic Frontier Foundation, Organization For Transformative Works, Public Knowledge, Francesca Coppa, David Mack, and Magdalene Visaggio.

Phillip R. Malone, Juelsgaard Intellectual Property and Innovation Clinic, Mills Legal Clinic at Stanford Law School, Stanford, California, for Amici Curiae Intellectual Property Law Professors.

Erik Stallman, Samuelson Law, Technology & Public Policy Clinic, University of California, Berkeley School of Law, Berkeley, California, for Amici Curiae Professors Mark A. Lemley, Jessica Litman, Lydia Loren, Pamela Samuelson, and Rebecca Tushnet.

# OPINION

McKEOWN, Circuit Judge:

In Dr. Seuss's classic book, *Oh, the Places You'll Go!* (*Go!*), the narrator counsels the protagonist on a path of exploration and discovery.  The book closes with this note of caution:

> I'm sorry to say so
> But, sadly it's true
> That Bang-ups
> And Hang-ups
> Can happen to you.

If he were alive today, Dr. Seuss might have gone on to say that "mash-ups can happen to you."

Enter *Oh, the Places You'll Boldly Go!* (*Boldly*). Authored by *Star Trek* episodes author David Gerrold, illustrated by Ty Templeton, and edited by fellow Trekkie Glenn Hauman (collectively, ComicMix), *Boldly* is a mash-up that borrows liberally—graphically and otherwise—from *Go!* and other works by Dr. Seuss, and that uses Captain Kirk and his spaceship *Enterprise* to tell readers that "life is an adventure but it will be tough."  The creators thought their *Star Trek* primer would be "pretty well protected by parody," but acknowledged that "people in black robes" may disagree.  Indeed, we do.

The question we consider is whether *Boldly*'s use of Dr. Seuss's copyrighted works is fair use and thus not an infringement of copyright.  Because all of the fair use factors favor Dr. Seuss, we reverse the district court's summary judgment in favor of ComicMix on the copyright infringement claim.  We affirm, however, the Rule 12(c)

dismissal and the grant of summary judgment in favor of ComicMix on the trademark claim.

## BACKGROUND

*Go!* was the final book written by the late Theodor S. Geisel, better known by his pseudonym, "Dr. Seuss." Many of the dozens of books Dr. Seuss authored and illustrated were wildly popular when they were published and have remained so throughout the decades. "Dr. Seuss" was the top licensed book brand of 2017. Notably, *Go!* has been "the number-one book on *The New York Times* Best Sellers list" "[e]very year during graduation season." The other Dr. Seuss works that are at issue—*How the Grinch Stole Christmas!* (*Grinch*) and *The Sneetches and Other Stories* (*Sneetches*)—also remain well-recognized. For simplicity, we refer to the relevant Dr. Seuss works collectively as *Go!*.

Today, Dr. Seuss Enterprises, L.P. (Seuss) owns the intellectual property in Dr. Seuss's works, including the copyrights in his books and the trademarks in his brand. Seuss markets the books to children and adults. Seuss also publishes reissues of the books, such as anniversary editions. And Seuss licenses and oversees the creation of new works under the Dr. Seuss brand. Seuss carefully vets the many licensing requests it receives and works closely with the licensees and collaborators to produce works based on Dr. Seuss's books.

The myriad licensed works that proliferate in the market include fine art, toys, video games, stage productions, motion pictures, and books that incorporate elements of Dr. Seuss's iconic works. *Go!* alone is the basis for several authorized derivative works such as the following books: *Oh, the Things You Can Do that Are Good for You!*; *Oh, the Places I'll Go! By ME, Myself*; *Oh, Baby, the Places You'll*

*Go!*; and *Oh, the Places I've Been! A Journal*.  Seuss has also entered into various collaborations to create new works that target the audiences of Seuss and its collaborators.  In one well-known collaboration, The Jim Henson Company and Seuss produced a television and book series called *The Wubbulous World of Dr. Seuss*, featuring "muppetized" Dr. Seuss characters.

*Boldly* is not a licensed work of Seuss.  Nor is it a collaboration or an otherwise authorized work. Nevertheless, in May 2016, David Gerrold (author of *Star Trek* episodes) and Glenn Hauman (Vice President of the publishing company ComicMix LLC) decided to send the *Enterprise* crew to a new literary world.  Gerrold and Hauman agreed to create a "Star Trek Primer"—a mash-up of *Star Trek* and another well-known primer.  A mash-up is "something created by combining elements from two or more sources," such as "a movie or video having characters or situations from other sources."  *Mash-up*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/mash-up.

After considering *Pat the Bunny* and other primers, Gerrold and Hauman decided to use *Go!* and to place the *Enterprise* crew in a colorful Seussian landscape full of wacky arches, mazes, and creatures—a world that is familiar to Dr. Seuss readers but a strange new planet for Captain Kirk's team.  They hired Ty Templeton, an experienced illustrator.  ComicMix purposely crafted *Boldly* so that the title, the story, and the illustrations "evoke" *Go!*.

ComicMix planned to publish and sell *Boldly*.  An e-commerce retailer, ThinkGeek, agreed to handle the distribution and merchandizing of *Boldly*, and placed a conditional order for 5,000 copies.  In August 2016, ComicMix started a successful crowdsourcing campaign on

Kickstarter to pay for production and other costs, eventually raising close to $30,000. The campaign also drew the attention of an editor at Andrews McMeel Publishing, who proposed doing a direct sale publication of *Boldly*.

The fundraising effort raised more than eyebrows when the Seuss organization became aware of *Boldly*. In September and October of 2016, Seuss sent ComicMix a cease-and-desist letter and two follow-up letters. ComicMix responded that *Boldly* was a fair use of *Go!*. Seuss also sent Kickstarter a takedown notice under the Digital Millennium Copyright Act; Kickstarter took down the campaign and blocked the pledged funds. *Boldly* remains unpublished.

Seuss filed suit against Hauman, Gerrold, Templeton, and ComicMix LLC in November 2016 for copyright infringement, trademark infringement, and unfair competition. The district court granted ComicMix's Rule 12(c) motion and dismissed Seuss's trademark infringement claim as it relates to the title of *Boldly*. The parties then filed cross-motions for summary judgment on the copyright claim, and ComicMix moved for summary judgment on the remainder of the trademark infringement claim. The district court granted ComicMix's summary judgment motion and denied Seuss's motion, holding that *Boldly* was a fair use of *Go!* and that the remainder of Seuss's trademark infringement claim failed.[1]

ComicMix does not dispute that it tried to copy portions of *Go!* as accurately as possible. Templeton urged the team

---

[1] Although Seuss alleged unfair competition claims in the Complaint, it failed to address them in its opening brief, and thus we do not consider those claims here. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

to "keep to [*Go!*'s] sentiment" that "life is an adventure but it WILL be tough and there WILL be setbacks, and you should not despair of them." As for the text of *Boldly*, Hauman created a side-by-side chart comparing the texts of *Go!* and *Boldly* in order to "match the structure of *Go!*." *Boldly* also closely mimics many illustrations in *Go!*, as a result of what ComicMix called "slavish[] copy[ing] from Seuss." In one instance, Templeton took "about seven hours" to copy a single illustration because he "painstakingly attempted to make" the illustration in *Boldly* "nearly identical" to its Seussian counterpart.

The issue in this appeal is not whether *Boldly* infringed *Go!*, but whether *Boldly!* was a fair use of *Go!*.[2] Gerrold and Hauman thought they could either get a license or create a parody, and concluded that *Boldly* "come[s] down well on the side of parody" and does not infringe Seuss's copyright. Templeton agreed. Despite being "slightly concerned," ComicMix did not consult a lawyer or pursue the option of a license.[3] This failure led to this lawsuit.

## ANALYSIS

## I. *Boldly* Does Not Make Fair Use of *Go!*

The fair use doctrine first took root in a case involving the biography of our first president. Justice Story asked whether copying the writings of President George Washington for a biography was "a justifiable use of the

---

[2] We received many thoughtful amicus briefs, and we thank amici for their participation.

[3] ComicMix also did not obtain a license for the use of *Star Trek* material, but the intellectual property in *Star Trek* is not at issue in this case.

original materials, such as the law recognizes as no infringement of the copyright . . . ." *See Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841). Although fair use was not codified until 1976, American copyright law has always counterbalanced the exclusive rights of a copyright with a fair use backstop. Under the statute, "fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107. "The fair use defense permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th Cir. 1997) (quotation marks and citation omitted).

The factors that determine fair use have changed little since Justice Story first announced them in *Folsom* and now are reflected in § 107 of the Copyright Act of 1976 as the following four non-exclusive factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107(1)–(4); *accord Folsom*, 9 F. Cas. at 348. Congress codified these factors without intending to disrupt

"the common-law tradition of fair use adjudication." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (citing H.R. Rep. No. 94-1476, p. 66 (1976)). The fair use defense remains an "equitable rule of reason." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984) (quoting H.R. Rep. No. 94-1476, p. 65).

Fair-use analysis, like the *Go!* protagonist's life journey, is "a Great Balancing Act." All four factors are "to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. The Supreme Court teaches that we should eschew "bright-line rules" and "categories of presumptively fair use," and instead engage in a "case-by-case analysis." *Id.* at 577, 584. As we have observed, fair use analysis can be elusive to the point of "approaching 'the metaphysics of the law, where the distinctions are . . . very subtle and refined, and, sometimes, almost evanescent.'" *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1171 (9th Cir. 2012) (quoting *Folsom*, 9 F. Cas. at 344). Not so with this case. Because all of the statutory factors decisively weigh against ComicMix and no countervailing copyright principles counsel otherwise, we conclude that *Boldly* did not make fair use of *Go!*.

## A. The Purpose and Character of *Boldly* Weigh Against Fair Use

The first statutory factor examines "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). This factor has taken on a heightened significance because it influences the lens through which we consider two other fair use factors. The third factor—the amount and substantiality of use—"will harken back" to the first factor. *See Campbell*, 510 U.S. at 586. And the fourth factor, relating to market harm, is influenced by whether the

commercial use was transformative. *See Monge*, 688 F.3d at 1181.

Although a commercial use is no longer considered presumptively unfair, the nature of the work remains "one element of the first factor enquiry." *Campbell*, 510 U.S. at 584–85. As explained below, *Boldly* is not transformative, and its indisputably commercial use of *Go!* counsels against fair use. *See Penguin Books*, 109 F.3d at 1401 (commerciality "further cuts against the fair use defense" when there is "no effort to create a transformative work").

The term "transformative" does not appear in § 107, yet it permeates copyright analysis because in *Campbell*, the Court interpreted the "central purpose" of the first-factor inquiry as determining "whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579. Transformative use of the original work can tip the first factor in favor of fair use.

A transformative work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* On the other hand, a work that "merely supersedes the objects of the original creation" is not transformative. *Id.* (quotation marks omitted). While the analysis of the first fair use factor "may be guided by the examples given in the preamble to § 107," i.e., criticism, comment, news reporting, teaching, scholarship, and research, *id.* at 578–79, not even these works compel "a per se finding of fair use," *Monge*, 688 F.3d at 1173. Thus, we do not ask whether mash-ups can be fair use—they can be—but whether *Boldly* is a transformative work.

The purpose and character of a parody fits squarely into preamble examples—particularly "criticism" and

"comment"—and has "an obvious claim" to transformative use. *Campbell*, 510 U.S. at 579. By definition, a parody must "use some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." *Id.* at 580. The need "to mimic an original to make its point" is the essence of parody. *Id.* at 580–81; *see Penguin Books*, 109 F.3d at 1400 (a parody must "conjure up" at least a part of "the object of [the] parody"). In short, a parody is a spoof, send-up, caricature, or comment on another work. A great example of a parody is the book *The Wind Done Gone*, which parrots portions of *Gone with the Wind* to offer a critical take on the book. *See Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1270–71 (11th Cir. 2001) ("It is hard to imagine" how a parody that attempts to "strip the romanticism" of slavery in *Gone with the Wind* can be made "without depending heavily upon copyrighted elements of that book."). On the other hand, if

> the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger.

*Campbell*, 510 U.S. at 580.

*Boldly* is not a parody. ComicMix does not seriously contend that *Boldly* critiques or comments on *Go!*. Rather, it claims *Boldly* is a parody because it situated the "violent, sexual, sophisticated adult entertainment" of *Star Trek* "in the context of [Dr. Seuss]" to create a "funny" book. We considered and rejected this very claim in an appeal

involving another well-known book by Dr. Seuss—*The Cat in the Hat* (*Cat*). The retelling of the O.J. Simpson double murder trial in the world of *Cat*—in a book titled *The Cat NOT in the Hat! A Parody by Dr. Juice* (*Not*)—was not a parody of *Cat*. *Penguin Books*, 109 F.3d at 1396, 1401. We explained that "broadly mimic[king] Dr. Seuss'[s] characteristic style" is not the same as "hold[ing] *his style* up to ridicule," and that without a critique of *Cat*, all *Not* did was "simply retell the Simpson tale" using the expressive elements of *Cat* "to get attention or maybe even to avoid the drudgery in working up something fresh." *Id.* at 1401 (quotation marks and citation omitted).

*Boldly*'s claim to a parody fares no better. Although elements of *Go!* are featured prominently in *Boldly*, the juxtapositions of *Go!* and *Star Trek* elements do not "hold [*Seussian*] *style*" up to ridicule. *Id.* From the project's inception, ComicMix wanted *Boldly* to be a *Star Trek* primer that "evoke[s]" rather than "ridicule[s]" *Go!*. Similarly, *Boldly*'s use of the other Seuss works does not conjure up a critique of *Go!*. *Boldly*'s replacement of *Grinch*'s "'Whos from Who-ville' with the diverse crew and Kirk's 'lovers of every hue,'" the redrawing of "a *Sneetches* machine to signify the *Enterprise* transporter," and the rendering of "the 'lonely games' played in *Go!*" as a "contemplative chess match between two Spocks" were all used to tell the story of the *Enterprise* crew's adventures, not to make a point about *Go!*. Lacking "critical bearing on the substance or style of" *Go!*, *Boldly* cannot be characterized as a parody. *Campbell*, 510 U.S. at 580.

We also reject as "completely unconvincing" ComicMix's "post-hoc characterization of the work" as criticizing the theme of banal narcissism in *Go!*. *Penguin Books*, 109 F.3d at 1403; *see also Castle Rock Ent., Inc. v.*

*Carol Publ'g Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1998) (ignoring similar "post hoc rationalizations"). The effort to treat *Boldly* as lampooning *Go!* or mocking the purported self-importance of its characters falls flat.

Nor is *Boldly* otherwise transformative. ComicMix argues that even if *Boldly* is not a parody, *Boldly* is transformative because it replaced Seuss characters and other elements with *Star Trek* material. Again, the *Cat* case repudiates ComicMix's position. There, efforts to leverage Dr. Seuss's characters without having a new purpose or giving Dr. Seuss's works new meaning similarly fell short of being transformative. The copyists "merely use[d]" what Dr. Seuss had already created—*e.g.*, "the Cat's stove-pipe hat, the narrator ("Dr. Juice"), and the title (*The Cat NOT in the Hat!*)"—and overlaid a plot about the O.J. Simpson murder trial without altering *Cat* "with 'new expression, meaning or message.'" *Penguin Books*, 109 F.3d at 1401 (quoting *Campbell*, 510 U.S. at 578). For the same reasons, ComicMix's efforts to add *Star Trek* material on top of what it meticulously copied from *Go!* fail to be transformative.

Notably, *Boldly* lacks the benchmarks of transformative use. These telltale signs of transformative use are derived from the considerations laid out in *Campbell*, our north star, and *Seltzer v. Green Day, Inc.* from our circuit: (1) "further purpose or different character" in the defendant's work, i.e., "the creation of new information, new aesthetic, new insights and understanding"; (2) "new expression, meaning, or message" in the original work, i.e., the addition of "value to the original"; and (3) the use of quoted matter as "raw material," instead of repackaging it and "merely supersed[ing]" the objects of the original creation." *See Campbell*, 510 U.S. at 579; *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2013) (quoting Leval, *Toward a*

*Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)). *Boldly* possesses none of these qualities; it merely repackaged *Go!*.

*Boldly*'s claim to transformative use rests on the fact that it has "extensive new content." But the addition of new expression to an existing work is not a get-out-of-jail-free card that renders the use of the original transformative. The new expression must be accompanied by the benchmarks of transformative use. *See, e.g.*, *Seltzer*, 725 F.3d at 1177–78; *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013); *Blanch v. Koons*, 467 F.3d 244, 251–52 (2d Cir. 2006).

Instead of possessing a further purpose or different character, *Boldly* paralleled *Go!*'s purpose. In propounding the same message as *Go*, *Boldly* used expression from *Go!* to "keep to [*Go!*'s] sentiment." Absent new purpose or character, merely recontextualizing the original expression by "plucking the most visually arresting excerpt[s]" of the copyrighted work is not transformative. *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938–39 (9th Cir. 2002). By contrast, reconstituting copyrighted expression was for a new, transformative purpose when a "seven-second clip of Ed Sullivan's introduction of the [band] Four Seasons on *The Ed Sullivan Show*" was used in the musical *Jersey Boys*, not to introduce the band's performance, but to serve "as a biographical anchor" about the band. *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1276, 1278 (9th Cir. 2013).

*Boldly* also does not alter *Go!* with new expression, meaning, or message. A "'transformative work' is one that alters the original work." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1164 (9th Cir. 2007) (quoting *Campbell*, 510 U.S. at 579). While *Boldly* may have altered *Star Trek* by sending Captain Kirk and his crew to a strange

new world, that world, the world of *Go!*, remains intact. *Go!* was merely repackaged into a new format, carrying the story of the *Enterprise* crew's journey through a strange star in a story shell already intricately illustrated by Dr. Seuss. Unsurprisingly, *Boldly* does not change *Go!*; as ComicMix readily admits, it could have used another primer, or even created an entirely original work. *Go!* was selected "to get attention or to avoid the drudgery in working up something fresh," and not for a transformative purpose. *Campbell*, 510 U.S. at 580.

Most telling is ComicMix's repackaging of *Go!*'s illustrations. The *Star Trek* characters step into the shoes of Seussian characters in a Seussian world that is otherwise unchanged. ComicMix captured the placements and poses of the characters, as well as every red hatch mark arching over the handholding characters in *Grinch*'s iconic finale scene, then plugged in the *Star Trek* characters. (The Seuss images always appear to the left of the *Boldly!* images juxtaposed in this opinion.)



ComicMix copied the exact composition of the famous "waiting place" in *Go!*, down to the placements of the couch and the fishing spot. To this, ComicMix added *Star Trek* characters who line up, sit on the couch, and fish exactly like the waiting place visitors they replaced. *Go!* continues to carry the same expression, meaning, or message: as the

18      DR. SEUSS ENTERPRISES V. COMICMIX LLC

*Boldly* text makes clear, the image conveys the sense of being stuck, with "time moving fast in the wink of an eye."



ComicMix also copied a scene in *Sneetches*,[4] down to the exact shape of the sandy hills in the background and the placement of footprints that collide in the middle of the page. Seussian characters were replaced with Spocks playing chess, making sure they "ha[d] similar poses" as the original, but all ComicMix really added was "the background of a weird basketball court."



ComicMix likewise repackaged *Go!*'s text. Instead of using the *Go!* story as a starting point for a different artistic or aesthetic expression, Hauman created a side-by-side comparison of the *Go!* and *Boldly* texts in order "to try to match the structure of *Go!*." This copying did not result in the *Go!* story taking on a new expression, meaning, or

---

[4] The illustration comes from a story called *The Zax*.

message.  Because *Boldly* "left the inherent character of the [book] unchanged," it was not a transformative use of *Go!*. *Monge*, 688 F.3d at 1176.

Although ComicMix's work need not boldly go where no one has gone before, its repackaging, copying, and lack of critique of Seuss, coupled with its commercial use of *Go!*, do not result in a transformative use.  The first factor weighs definitively against fair use.

## B.  The Nature of *Go!* Weighs Against Fair Use

The second statutory factor considers the "the nature of the copyrighted work."  17 U.S.C. § 107(2).  This factor "recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works, 'with the consequence that fair use is more difficult to establish when the former works are copied.'" *Penguin Books*, 109 F.3d at 1402 (quoting *Campbell*, 510 U.S. at 586).  Hence, *Boldly*'s copying of a creative and "expressive work[]" like *Go!* tilts the second factor against fair use.  *Campbell*, 510 U.S. at 586.

This factor also considers whether the copied work is unpublished, a consideration that is not relevant for the Seuss works.  "[T]he unpublished nature of a work is a key, though not necessarily determinative, factor tending to negate a defense of fair use," because a copyist's initial publication of the work undermines "the author's right to control the first public appearance of his undisseminated expression." *Harper & Row, Publishers Inc. v. Nation Enter.*, 471 U.S. 539, 554–55 (1985) (quotation marks omitted).  But the converse is not necessarily true; neither *Harper & Row* nor any principle of fair use counsels that the publication of the copyrighted work weighs in favor of fair use.  *See* 4 William F. Patry, *Patry on Copyright* § 10:139.30 (2020) (explaining

that "the fact that a work is published does not mean that the scope of fair use is per se broader").

Mindful that the second factor "typically has not been terribly significant in the overall fair use balancing," *Penguin Books*, 109 F.3d at 1402, we conclude that the creative nature of *Go!* weighs against fair use.

## C.  The Amount and Substantiality of the Use of *Go!* Weigh Against Fair Use

The third statutory factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" favor fair use.  17 U.S.C. § 107(3).  We consider both "the quantitative amount and qualitative value of the original work used in relation to the justification for that use."  *Seltzer*, 725 F.3d at 1178.  This factor circles back to the first factor because "the extent of permissible copying varies with the purpose and character of the use."  *Campbell*, 510 U.S. at 586–87.

The quantitative amount taken by *Boldly* is substantial. To be sure, we understand that "[t]he inquiry under this factor is a flexible one, rather than a simple determination of the percentage of the copyrighted work used."  *Monge*, 688 F.3d at 1179.   That said, ComicMix's copying was considerable—it copied "14 of *Go!*'s 24 pages," close to 60% of the book, and significant "illustrations from *Grinch* and two stories in *Sneetches*."  Crucially, ComicMix did not merely take a set of unprotectable visual units, a shape here

and a color patch there.[5]  For each of the highly imaginative illustrations copied by ComicMix, it replicated, as much and as closely as possible from *Go!*, the exact composition, the particular arrangements of visual components, and the swatches of well-known illustrations.

ComicMix's claim that it "judiciously incorporated just enough of the original to be identifiable" as Seussian or that its "modest" taking merely "alludes" to particular Seuss illustrations is flatly contradicted by looking at the books. During his deposition, *Boldly* illustrator Templeton detailed the fact that he "stud[ied] the page [to] get a sense of what the layout was," and then copied "the layout so that things are in the same place they're supposed to be."  The result was, as Templeton admitted, that the illustrations in *Boldly* were "compositionally similar" to the corresponding ones in *Go!*.  In addition to the overall visual composition, Templeton testified that he also copied the illustrations down to the last detail, even "meticulously try[ing] to reproduce as much of the line work as [he could]."

---

[5] We are cautious not to overzealously decompose visual expression into its abstract, and thus unprotectable, units, because that would mean that any amount of taking by ComicMix would be permissible.  *See Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1003 (2d Cir. 1995) (critiquing the view that "there can be no originality in a painting because all colors of paint have been used somewhere in the past" (citation omitted)).

Again, we turn to *Boldly* itself for illustrative examples. Here, ComicMix replicated the overall composition and placement of the shapes, colors and detailed linework.



ComicMix also took the overall composition of a Seuss illustration—the placement of the tree, the hills, and the white space surrounding these elements. The trees in both versions have the same exact number, bends, and lengths of branches, with the same branch in both versions hoisting a dangling figure. ComicMix's "'verbatim' copying of the original" weighs against fair use. *Campbell*, 510 U.S. at 589.



The qualitative value used by *Boldly* is also substantial. The qualitative analysis often asks if the copyist took the "heart," that is, "the most valuable and pertinent portion," of the work. *L.A. News Serv.*, 305 F.3d at 940. Taking "the 'heart' of each individual copyrighted picture," tilts the third factor against fair use. *Monge*, 688 F.3d at 1178.

ComicMix took the heart of Dr. Seuss's works. For example, ComicMix's copying of a *Sneetches* illustration exhibits both the extensive quantitative and qualitative taking by ComicMix. *Sneetches* is a short Seuss story about two groups of Sneetches: the snooty star-bellied Sneetches and the starless ones. The story's plot, the character, and the moral center on a highly imaginative and intricately drawn machine that can take the star-shaped status-symbol on and off the bellies of the Sneetches. Different iterations of the machine, the heart of *Sneetches*, appear in ten out of twenty-two pages of the book. *See Penguin Books*, 109 F.3d at 1402 (the element that "appear[s] in nearly every image of [*Cat*]" is "the highly expressive core of Dr. Seuss'[s] work").

ComicMix took this "highly expressive core" of *Sneetches*. Templeton testified that "the machine in the Star-Bellied Sneetches story" was "repurposed to remind you of the transporter" in *Star Trek*. Drawing the machine "took . . . about seven hours" because Templeton tried to "match" the drawing down to the "linework" of Seuss. He "painstakingly attempted" to make the machines "identical." In addition to the machine, *Boldly* took "the poses that the Sneetches are in" so that "[t]he poses of commander Scott and the Enterprise crew getting into the machine are similar." *Boldly* also captured the particular "crosshatch" in how Dr. Seuss rendered the machine, the "puffs of smoke coming out of the machine," and the "entire layout."



Finally, we cannot countenance ComicMix's argument that the amount taken is not substantial because ComicMix used only five out of almost sixty Dr. Seuss books. This is fake math that distorts the result because ComicMix has identified the wrong denominator; the third factor looks at "the amount and substantiality of the portion used *in relation to the copyrighted work as a whole*," not to the entire corpus of the author. 17 U.S.C. § 107(3) (emphasis added). Under ComicMix's theory, the more prolific the creator, the greater license a copyist would have to copy and imitate the original works. Nothing supports that argument.

Given the absence of a parody or a transformative work, ComicMix offers no justification for the commercial exploitation and the extensive and meticulous copying of *Go!*. In fact, after the case was initiated, Gerrold offered to "replace the stuff that's too dead on," demonstrating that the mash-up "based on Dr. Seuss's artwork" could have been created without wholesale copying of the work. The third factor weighs decisively against fair use.

### D. The Potential Market for or Value of Seuss Weighs Against Fair Use

The fourth and final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Courts must address "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market' for the original" and "the market for derivative works." *Campbell*, 510 U.S. at 590 (quotation marks and citations omitted). Having found that *Boldly* was transformative—a conclusion with which we disagree—the district court also erred in shifting the burden

to Seuss with respect to market harm. That shifting, which is contrary to *Campbell* and our precedent, led to a skewed analysis of the fourth factor.

Mindful of the Court's directive to "eschew[] presumptions under this factor, we refrain from presuming harm in the potential market" for commercial uses and "determine it in the first instance." *Monge*, 688 F.3d at 1181. Still, we recognize that ComicMix's non-transformative and commercial use of Dr. Seuss's works likely leads to "cognizable market harm to the original." *Campbell*, 510 U.S. at 591; *see Penguin Books*, 109 F.3d at 1403 ("Because, on the facts presented, [the defendants'] use of [the *Cat*] original was nontransformative, and admittedly commercial, we conclude that market substitution is at least more certain, and market harm may be more readily inferred.").

Not much about the fair use doctrine lends itself to absolute statements, but the Supreme Court and our circuit have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use. ComicMix tries to plow a new ground in contending that fair use is not an affirmative defense and that the burden shifts to Seuss to prove potential market harm. *Campbell* squarely forecloses this argument: "[s]ince fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell*, 510 U.S. at 590 (footnote omitted); *see also Harper & Row*, 471 U.S. at 561. We have echoed that principle. "[F]air use is an affirmative defense," thus requiring the defendant to "bring forward favorable evidence about relevant markets." *Penguin Books*, 109 F.3d at 1403; *see Monge*, 688 F.3d at 1170 ("As with all

affirmative defenses, . . . the defendant bears the burden of proof" on fair use.).[6]

In an effort to distinguish controlling precedent, ComicMix argues that in *Lenz v. Universal Music Corp.*, we deviated from our precedent construing fair use as an affirmative defense. 815 F.3d 1145 (9th Cir. 2016). This view misreads *Lenz*, which involved fair use in a different corner of the copyright law, the safe harbor for Internet service providers under the Digital Millennium Copyright Act (DMCA). We held that to avoid liability under 17 U.S.C. § 512(f), a copyright holder must "consider the existence of fair use before sending a takedown notification." *Id.* at 1151, 1153; *see* 17 U.S.C. § 512(c)(3)(A). More pointedly, we examined the nature of fair use emphatically "for the purposes of the DMCA," and explicitly went on to note that in *that* context, "fair use is uniquely situated in copyright law so as to be treated differently than traditional affirmative defenses." *Lenz*, 815 F.3d at 1153. In no way did we deviate from our characterization of fair use as an affirmative defense under § 107. To the contrary, in addition to clarifying that, unlike copyright misuse and laches, fair use is not an excuse to copyright infringement, we reiterated that "the burden of proving fair use is always on the putative infringer." *Id.* at 1152–53 (quoting *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1542 n.22 (11th Cir. 1996)).

Hence, ComicMix, as the proponent of the affirmative defense of fair use, "must bring forward favorable evidence

---

[6] Although the Eleventh Circuit has suggested that it is sometimes "reasonable to place on Plaintiffs the burden of going forward with evidence on" the fourth factor, *see Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1279 (11th Cir. 2014), we have never adopted this view.

about relevant markets." *Penguin Books*, 109 F.3d at 1403. Because ComicMix's position is that it does not bear the burden of proof, it does not argue the adequacy of its scant evidence. ComicMix principally relies on the expert report of Professor Joshua Gans. The entire report is premised on *Boldly* being transformative, which it is not, and on the expert's misunderstanding about fair use and U.S. copyright law. But even if we put aside the false premises of the report, and, for the sake of argument, credit its methodology and conclusions, the report fails to account for key fourth-factor considerations.[7] We conclude that ComicMix did not meet its burden on the fourth factor.

First, ComicMix sidesteps the fact that it intentionally targeted and aimed to capitalize on the same graduation market as *Go!*. The planned release date for the first publication of *Boldly* was scheduled to launch "in time for school graduations." ComicMix acknowledged that *Boldly*'s use of *Go!* will "resonate so much, especially as a graduation gift for folks who grew up reading Seuss." The assertion that the two works target different age groups is undermined by ComicMix's own admission that *Boldly* is "safe" for five-year-olds and "a perfect gift for children and adults of all ages."

Nor does ComicMix address a crucial right for a copyright holder—the derivative works market, an area in which Seuss engaged extensively for decades. *See* 17 U.S.C. § 106(2). A relevant derivative works market includes

---

[7] Seuss moved to exclude the Gans report under Federal Rule of Evidence 702. The district court denied the motion as moot because it did not rely on the report. We do not review the district court's ruling or otherwise offer our view on the motion. We simply note that *even if* the Gans report is an admissible expert opinion, it would be insufficient to tilt the fourth factor in ComicMix's favor.

"those that creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 592. Seuss has already vetted and authorized multiple derivatives of *Go!*, including the following books: *Oh, The Things You Can Do That Are Good For You!*; *Oh, the Places I'll Go! By ME, Myself*; *Oh, Baby, the Places You'll Go!*; and *Oh, the Places I've Been! A Journal*. Recently, Seuss announced that it has partnered with Warner Animation Group to adapt *Go!* into an animated motion picture, scheduled for theatrical release in 2027. *See* Dave McNary, *Dr. Seuss' 'Cat in the Hat' Spinoff and 'Oh, The Places You'll Go' Getting Movie Adaptations*, Variety (Oct. 1, 2020).

Works like *Boldly* would curtail *Go!*'s potential market for derivative works. This is not a case where the copyist's work fills a market that the copyright owner will likely avoid, as is true for "a lethal parody" or "a scathing theater review." *Campbell*, 510 U.S. at 591–92. In fact, ComicMix hoped to get to one of the potential markets for Seuss's derivative works before Seuss, believing that Seuss would "want to publish it themselves and give [ComicMix] a nice payday."

Crucially, ComicMix does not overcome the fact that Seuss often collaborates with other creators, including in projects that mix different stories and characters. Seuss routinely receives requests for collaborations and licenses, and has entered into various collaborations that apply Seuss's works to new creative contexts, such as the television and book series entitled *The Wubbulous World of Dr. Seuss*, a collaboration with The Jim Henson Company, famous for its puppetry and the creation of other characters like the Muppets. Other collaborations include a digital game called *Grinch Panda Pop*, that combines Jam City's

Panda character with a *Grinch* character; figurines that combine Funko Inc.'s toy designs with Seuss characters; and a clothing line that combines Comme des Garçons' heart design with *Grinch* artwork.

ComicMix takes issue with Seuss's apparent choice not to license a mash-up based on Dr. Seuss's works sans Dr. Seuss's characters. We say "apparent" because ComicMix only infers, from Seuss's style guide for its licensees, that Seuss will not license a Seuss–*Star Trek* mash-up. But, of course, that claim is speculative because ComicMix never asked for a license or permission. Also, the law does not limit the scope of the relevant market to products that are already made or in the pipeline. "The potential market . . . exists independent of the [copyright owner]'s present intent." *Monge*, 688 F.3d at 1181. Seuss certainly has the right to "the artistic decision not to saturate those markets with variations of their original," *Castle Rock Ent.*, 150 F.3d at 146, and it has the right "to change [its] mind," *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000).

Finally, ComicMix does not address a central aspect of market harm set out in *Campbell*—"whether unrestricted and widespread conduct of the sort engaged in" by ComicMix would undermine Seuss's potential market. 510 U.S. at 590 (quotation marks and citation omitted). This aspect is particularly significant here because of Seuss's strong brand. ComicMix's effort to use Seuss's success against it falls flat. As noted by one of the amici curiae, the unrestricted and widespread conduct of the sort ComicMix is engaged in could result in anyone being able to produce, without Seuss's permission, *Oh the Places* Yoda'*ll Go!*, *Oh the Places You'll* Pokemon *Go!*, *Oh the Places You'll* Yada

Yada Yada*!*, and countless other mash-ups.[8]  Thus, the
unrestricted and widespread conduct of the sort engaged in
by ComicMix could "create incentives to pirate intellectual
property" and disincentivize the creation of illustrated
books.  *Monge*, 688 F.3d at 1182.  This is contrary to the goal
of copyright "[t]o promote the Progress of Science."  U.S.
Const. art. I, § 8, cl. 8.

The bottom line is that ComicMix created, without
seeking permission or a license, a non-transformative
commercial work that targets and usurps *Go!*'s potential
market.  ComicMix did not carry its burden on the fourth
factor.  Based on our weighing of the statutory factors "in
light of the purposes of copyright," we conclude that
ComicMix cannot sustain a fair use defense.  *See Campbell*,
510 U.S. at 578.  The district court erred in granting
summary judgment in favor of ComicMix.

## II.  SEUSS DOES NOT HAVE A COGNIZABLE TRADEMARK INFRINGEMENT CLAIM AGAINST COMICMIX

Seuss also claims that ComicMix infringed its registered
and common law trademarks in the title of *Go!*, as well as
common law trademarks in the "Seussian style of
illustration" and "the Seussian font."  We do not express a
view as to whether the Seussian style of illustration and font
are valid common law trademarks, because Seuss's
trademark infringement claim fails as a matter of law.

The allegedly infringing use of trademarks in an
expressive work like *Boldly* raises the threshold question of
whether the Lanham Act applies.  The *Rogers* test, first

---

[8] Brief of Amici Curiae of Professors Peter S. Menell, Shyamkrishna
Balganesh, and David Nimmer in Support of Petitioners at 2.

articulated by the Second Circuit and later adopted by our court, balances artistic free expression and trademark rights to determine whether the Lanham Act applies. *See Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) (adopting the *Rogers* test); *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) (expanding the *Rogers* test from the use of a trademark in a *title* to the *body* of the expressive work). Under the *Rogers* test, the trademark owner does not have an actionable Lanham Act claim unless the use of the trademark is "either (1) not artistically relevant to the underlying work or (2) explicitly misleads consumers as to the source or content of the work." *VIP Prods. LLC v. Jack Daniel's Props., Inc.*, 953 F.3d 1170, 1174 (9th Cir. 2020) (quotation marks omitted). Neither of these prongs is easy to meet.

As to the first prong, any artistic relevance "above zero" means the Lanham Act does not apply unless the use of the trademark is explicitly misleading. *Twentieth Century Fox Television v. Empire Distribution, Inc.*, 875 F.3d 1192, 1198 (9th Cir. 2017) (citing *E.S.S. Entm't*, 547 F.3d at 1100); *see also Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245 (9th Cir. 2013) (explaining that "even the slightest artistic relevance" is enough). *Boldly* easily surpasses this low bar: as a mash-up of *Go!* and *Star Trek*, the allegedly valid trademarks in the title, the typeface, and the style of *Go!* are relevant to achieving *Boldly*'s artistic purpose.

Nor is the use of the claimed *Go!* trademarks "explicitly misleading," which is a high bar that requires the use to be "an 'explicit indication,' 'overt claim,' or 'explicit misstatement'" about the source of the work. *Brown*, 724 F.3d at 1245. Thus, although titling a book "Nimmer on Copyright," "Jane Fonda's Workout Book," or "an

authorized biography" can explicitly misstate who authored or endorsed the book, a title that "include[s] a well-known name" is not *explicitly* misleading if it only "*implicitly* suggest[s] endorsement or sponsorship." *Rogers*, 875 F.2d at 999–1000 (emphasis added).

*Boldly* is not explicitly misleading as to its source, though it uses the Seussian font in the cover, the Seussian style of illustrations, and even a title that adds just one word—*Boldly*—to the famous title—*Oh, the Places You'll Go!*. Seuss's evidence of consumer confusion in its expert survey does not change the result. The *Rogers* test drew a balance in favor of artistic expression and tolerates "the slight risk that [the use of the trademark] might implicitly suggest endorsement or sponsorship to some people." *Id.* at 1000.

A contrary result is not compelled by our recent decision in *Gordon v. Drape Creative, Inc.*, involving a registered trademark for, among other things, greeting cards. 909 F.3d 257 (9th Cir. 2018). The mark—"Honey Badger Don't Care"—is a popular comical statement that represents an "aggressive assertion of apathy." *Id.* at 268–69. The defendant created greeting cards featuring, on the front, a honey badger and an indication of the occasion the card is designed for (birthday, Halloween, etc.), and on the inside, the punchline: "Honey Badger Don't Care." *Id.* at 260–62. *Gordon* "demonstrate[d] *Roger*'s outer limits," where the defendant's expressive work consisted of the mark and not much else. *Id.* at 261, 268–69. Under this scenario, the court concluded that there was a triable issue of fact as to whether the mark was explicitly misleading. *Id.* at 271.

*Boldly* does not test the "outer limits" of *Rogers*.  We reiterated in *Gordon* that because "use of a trademark alone" is not necessarily determinative, two "more relevant consideration[s]" weigh in evaluating whether the mark is explicitly misleading: (1) "the degree to which the junior user uses the mark in the same way as the senior user" and (2) "the extent to which the junior user has added his or her own expressive content to the work beyond the mark itself." *Gordon*, 909 F.3d at 270–71 (quoting *E.S.S. Entm't*, 547 F.3d at 1100) (citing *Rogers*, 875 F.2d at 999).  Here, ComicMix has used the marks in an illustrated book just as Seuss did, but unlike with the greeting cards in *Gordon*, ComicMix has "added . . . expressive content to the work beyond the mark itself." *Id.* at 270.  Also, the cover conspicuously lists David Gerrold and Ty Templeton, not Dr. Seuss, as authors, and *Boldly* states that it is "not associated with or endorsed by" Seuss.  In consideration of "all the relevant facts and circumstances," the alleged use of Seuss's trademarks is not explicitly misleading. *Id.* at 269 (quoting *Rogers*, 875 F.2d at 1000 n.6).  We affirm the district court's denial of Seuss's trademark claim because the Lanham Act does not apply here.

## CONCLUSION

This appeal involves two different contexts in which an author's expression collides with the intellectual property rights in existing works.  Here, the results for the copyright and the trademark claims diverge.  Although *Boldly* did not make fair use of the copyrighted expression in *Go!*, *Boldly*'s use of *Go!* trademarks was permitted under the *Rogers* test. Accordingly, we affirm the district court's Rule 12(c) dismissal and summary judgment in favor of ComicMix as to the trademark infringement claim, but reverse and remand

the district court's grant of summary judgment in favor of ComicMix as to copyright fair use.

**AFFIRMED in PART; REVERSED and REMANDED in PART for proceedings consistent with this opinion.**

Each party shall pay its own costs on appeal.